SEP 17 2024 PM3:55
FILED-USDC-CT-NEW.HAVEN

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| IN THE MATTER OF THE SEARCH OF TARGET DEVICES, CURRENTLY LOCATED IN LAW ENFORCEMENT CUSTODY WITHIN THE DISTRICT OF CONNECTICUT | Case No. 3:24 mj 837 RMS<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Andrew Pfeiffer, a Task Force Officer with the Drug Enforcement Administration being first duly sworn, hereby depose and state as follows:

### AGENT BACKGROUND

1.     I am a member of the Hamden Police Department in the capacity of a sworn police officer and have been employed as a certified police officer in the State of Connecticut since 2012. I am assigned to the Hamden Police Department Street Interdiction Team and am currently assigned as a Task Force Officer (TFO) for the Drug Enforcement Administration (DEA), New Haven District Office (NHDO)-Tactical Diversion Squad (TDS), and have been so assigned since 2019.   My duties include investigating violations of the Connecticut General Statutes and the federal Controlled Substances Act, including but not limited to the diversion of controlled substances from legitimate medical channels.

2.     As a law enforcement officer, I have conducted numerous investigations of violations of the law, which have led to arrests and convictions.   I have coordinated controlled purchases of illegal drugs using confidential sources and cooperating witnesses.   I have planned and participated in the execution of state and federal search warrants pertaining to individuals involved in the distribution of controlled substances, conducted electronic surveillance and physical surveillance of

1

individuals involved in the distribution of controlled substances, analyzed records documenting the purchase and sale of illegal drugs, and spoken with informants and subjects, as well as other local, state, and federal law enforcement officers, regarding the manner in which narcotics traffickers obtain, finance, store, manufacture, transport, and distribute illegal drugs.

3.      I am a case agent investigating KELLDON HINTON, HESHIMA HARRIS, EMANUEL PAYTON, SHAWN STEPHENS, and ARNALDO ECHEVARRIA, who were arrested on September 5, 2024, based upon a criminal complaint issued by this Court on September 4, 2024. HINTON was charged with Conspiracy to Manufacture, Distribute, and Possess with the Intent to Distribute Controlled Substances, including 50 Grams or More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B)(viii), (b)(1)(C), and 846, and HARRIS, PAYTON, STEPHENS, and ECHEVARRIA were charged with Conspiracy Manufacture, Distribute, and Possess with the Intent to Distribute Controlled Substances in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C) and 846) (collectively, the "Charged Offenses").

## PURPOSE OF THE AFFIDAVIT

4.      I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Civil Procedure for a search warrant authorizing the examination of:

(a)  One gray LG flip phone (DEA Exhibit N-35);

(b)  One dark gray TCL flip phone (DEA Exhibit N-36);

(c)  One black "Schok" smartphone (DEA Exhibit N-37);

(d)  One black "TCL" smartphone (DEA Exhibit N-38);

(e)  One gray "Samsung" smartphone (DEA Exhibit N-39);

2

(f)  One black and silver Samsung folding smartphone (DEA Exhibit N-40);

(g)  One black iPhone (DEA Exhibit N-41);

(h)  One black iPhone (DEA Exhibit N-42);

(i)  One black TCL smartphone (DEA Exhibit N-43;

(j)  One black Google smartphone (DEA Exhibit N-17);

(k)  One black iPhone (DEA Exhibit N-15); and

(l)  iPhone with brown case (DEA Exhibit N-20),

(collectively, the "TARGET PHONES"), further described in Attachments A-1 through A-12, respectively, which were obtained from HINTON, HARRIS, PAYTON, STEPHENS and ECHEVARRIA at the time of the execution of the federal search warrants and federal arrest warrants on or about September 5, 2024, and which are currently located at the DEA New Haven District Office evidence locker and the extraction from that property of electronically stored information described in Attachment B-1.

5.      I also submit this affidavit in support of an application under Rule 41 of the Federal Rules of Civil Procedure for a search warrant authorizing the examination of: a red HP laptop, serial number CND1366HN (the "TARGET LAPTOP"), further described in Attachment A-13, which was obtained during the search of 34 Tyler Street Extension in East Haven on September 5, 2024, which is also currently located at the DEA NHDO and further identified as DEA Evidence Number N-44 and the extraction from that property of electronically stored information described in Attachment B-2.

6.      I also submit this affidavit in support of an application under Rule 41 of the Federal Rules of Civil Procedure for a search warrant authorizing the examination of: a blue Samdata thumb

drive and a black Samdata thumb drive (collectively, the "TARGET THUMB DRIVES"), further described in Attachments A-14 and A-15, which were obtained during the search of 34 Tyler Street Extension in East Haven on September 5, 2024, and which are currently located at DEA NHDO and further identified as DEA Evidence Number N-45 and exhibit N-46.

7.    Based on the information set forth in this affidavit, I believe there is probable cause to believe that the TARGET PHONES, the TARGET LAPTOP and the TARGET THUMB DRIVES (collectively, the "TARGET DEVICES") contain evidence of the Charged Offenses.

## PROBABLE CAUSE

8.    On September 5, 20244, DEA Task Force Officer Andrew Pfeiffer signed an affidavit in support of search warrants for 34 Tyler Street Extension, East Haven, CT ("Target Location 1") and 55 Dewitt Street, New Haven, CT ("Target Location 2"); and one 2023 Gray Chevy Malibu bearing NY marker plate LJX9536 ("Target Vehicle 1") being used by HINTON in furtherance of the Charged Offenses, and in support of arrest warrants for HINTON, HARRIS, PAYTON, STEPHENS and ECHEVARRIA for the Charged Offenses. A copy of that affidavit (hereinafter, the "Original Affidavit") has been attached as Attachment C and incorporated herein.

### Device Seizures at HINTON's Residence

9.    On September 5, 2024, agents and task force officers of the Drug Enforcement Administration ("DEA"), along with Federal Bureau of Investigation ("FBI"), Homeland Security Investigations ("HSI"), United States Postal Inspection Service ("USPIS"), Connecticut State Police ("CSP"), West Haven Police Department, Hamden Police Department, East Haven Police Department and New Haven Police Department executed the federal search warrants and federal arrest warrants listed in the affidavit.

10.     Upon the execution of the federal search warrant at HINTON's residence at 55 Dewitt Street in New Haven ("Target Location 2") shortly after approximately 6:00 a.m., agents encountered HINTON, the sole occupant of the dwelling, in the foyer, dressed in sleepwear attire. Investigators provided HINTON with a pair of pants and a sweatshirt prior to transport. In HINTON's bedroom, on the nightstand, investigators located exhibit N-35, a gray LG flip phone and exhibit N-36, a dark gray TCL flip phone. These phones were in arms reach and readily accessible to HINTON while laying in bed. Based on the clothing located in the bedroom being consistent with a male of HINTON's stature, it appeared to investigators that HINTON was the only person consistently staying in the bedroom.

11.     Also in HINTON's bedroom, located on top of the bed were three (3) smartphones. These smartphones included a black TCL smartphone (Exhibit N-38); a gray Samsung smartphone (Exhibit N-39); and a black and silver Samsung folding smartphone (Exhibit N-40). The bed appeared disheveled and recently slept in. While collecting evidence from HINTON's bedroom, investigators called telephone number (475) 355-0907, which had been identified during the investigation as a drug phone used to contact DTO members and customers and the gray Samsung smartphone (Exhibit N-39) began to ring.  Similarly, investigators also called telephone number (475) 301-3656, which had been listed on a package containing one kilogram of xylazine, sent from China to HARRIS' residence at 539 East Street, New Haven that was seized by CBP and the black TCL smartphone (Exhibit N-38) began to ring.[1]

---

[1] On the floor, behind the nightstand, investigators also observed a blue plastic bag containing six smartphones. These phones were all powered off and appeared brand new in cases. These phones were seized but investigators are not seeking a court order to examine them. Investigators decided to seek a court order only on those phones that were readily accessible to be used and those that had been used in the past.

12.     Located in the laundry room closet of HINTON's residence, hidden in a void space above the molding of the door and the ceiling was a black Schok smartphone (Exhibit N-37). Also located within the same void was an undetermined amount of US currency and a multitude of controlled substances consisting of a bag of round, blue tablets marked M/30, suspected fake oxycontin, white powder of suspected protonitazene, purple powder of suspected MDMA, and blue bar shaped tablets marked "b707" of suspected fake Xanax, which are consistent with the type of controlled substances, including pills, that HINTON was manufacturing at his 34 Tyler Street Extension laboratory.   Based on the unique location of this spot used to stash only a few specific items relating to HINTON's drug trafficking activity, namely, pressed pills and U.S. currency, the proximity of this particular black Schok smartphone (N-37) readily suggests that HINTON possessed this particular cell phone for no other purpose but in furtherance of the Charged Offenses.

### *Device Seizures at HINTON's Garage Laboratory*

13.     On that same date, while executing the federal search warrant at HINTON's garage located at 34 Tyler Street Extension in East Haven, DEA, which HINTON had converted into a fully operational counterfeit pill manufacturing laboratory with a commercial-grade pill press machine identified by investigators as a ZP33, bulk quantities of cut, homogenizers, mixers and other instruments, and approximately 1.5 million tablets of counterfeit oxycodone, Adderall, Xanax and Percocet pills suspected to contain protonitazene, dimethypentalone and xylazine.   In the rear room of the laboratory on top of a table next to the pill press machine, large quantities of cut and other pill filler, and bins of pressed pills, along with mailing materials, investigators located a laptop computer (DEA Exhibit N-44). Investigators also located two thumb drives (Exhibits N-45 and N-46) in the

front room of the laboratory in a desk drawer that also contained bags of pressed pills and a set of calipers (used to measure pill dimensions).

### *HINTON's Use of Devices in Connection with the Charged Offenses*

14.     As set forth in the Original Affidavit, HINTON appeared to be utilizing numerous phone numbers in connection with his counterfeit pill pressing operations. For example, extensive toll analysis and public indices checks revealed HINTON's most recent telephone number was 475-355-0907. Several predecessor telephones were identified to be utilized concurrently by HINTON throughout this investigation. These numbers included 475-301-3656, 203-233-7687 and 203-671-7586. Based on my training and experience, I know that maintaining and utilizing multiple cell phones is a common tactic of drug traffickers. This tactic is used to compartmentalize communications between customers, DTO members and sources of supply. Having a compartmentalized network allows a degree of security to traffickers in the event one of the cellphones is compromised or seized by law enforcement. In addition, investigators know that HINTON maintains a number of dark web-based vendor pages to facilitate the majority of his drug distribution. To access those vendor pages, HINTON would need to maintain additional cell phones to support the two-factor authentication in signing on.

15.     Moreover, over the course of this investigation, HINTON was observed by law enforcement at his pill pressing laboratory at 34 Tyler Street Extension almost daily, for hours at a time.   HINTON did not appear to have any other meaningful source of income or employment while committing the Charged Offenses.   In fact, multiple ledgers located within the 34 Tyler Street Extension garage laboratory included what appear to be itemized lists of business expenses, such as "Gas," "Electricity," "Water," and "Meth."   In other entry, investigators located two lists, one

entitled "Legal" that included items such as "coffee" and "electrolyte drink mix" and on the same page a second list entitled "Extra business" that included items such as "molds for ZP33," and "duster machine" and "measuring cup" alongside "materials" such as "xylazine" and "iso or etonitazene," and "mdma." And in text message, while also speaking with confederates, he spoke about his laboratory activities with family members, such as his daughter, *see* Original Affidavit at ¶ 81. In other words, all of HINTON's activities and communications—both personal and business—revolved around the operation of his laboratory, which was used to commit the Charged Offenses. As such, I believe that HINTON maintained each of the cell phones identified above in furtherance of his counterfeit pill manufacturing operation and his associated drug trafficking activities, and/or communicated about that business on each of the cell phones identified above.

16.     Similarly, as set forth in the Original Affidavit, HINTON also appeared to be utilizing the dark web to distribute his counterfeit pills and other controlled substances. *See* Original Affidavit, ¶¶ 45-66. Based on my training and experience, I know that dark web drug traffickers will use computers, in addition to cell phones to manage their vendor pages. These activities can include accepting and processing orders, packaging orders, updating listings, and communicating with customers. Here, the location of HINTON's thumb drives exhibits N-45, N-46, located in the rear room inside a desk drawer also containing pressed pills and the location of HINTON's laptop computer exhibit N-44 was located in the rear room of the laboratory, on top of a table next to the pill press machine, large quantities of cut and other pill filler, and bins of pressed pills, along with mailing materials, provide more than probable cause to believe that both the laptop and the two thumb drives were being used in furtherance of the Charged Offenses and contains evidence of those Charged Offenses, including but not limited to Conspiracy to Manufacture, Distribute, and Possess

8

with the Intent to Distribute Controlled Substances, including 50 Grams or More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B)(viii), (b)(1)(C), and 846.

### *Heshima HARRIS's Cell Phone Seizure*

17. On the same date, DEA investigators executed the federal arrest warrant for Heshima HARRIS at his residence "Target Location 3" located at 539 East Street, New Haven, CT. Upon the execution of that arrest warrant, agents seized one iPhone with brown case (Exhibit N-15). HARRIS was located in his bedroom. Subsequent to his arrest, investigators observed, in plain view, the cellphone was on top of the bed. Investigators verified the seized telephone was the same telephone used by HARRIS throughout this investigation by calling the HARRIS telephone number previously linked to HARRIS. The seized phone began to ring and displayed the incoming call. Throughout this investigation, HARRIS was previously observed using the HARRIS TELEPHONE, as previously described in the Original Affidavit. For example, HARRIS used the HARRIS TELEPHONE to exchange text messages with HINTON to coordinate a meeting for the purpose of ordering Xanax and Adderall tablets from HINTON on March 11, 2024. HARRIS also communicated with HINTON over the HARRIS TELEPHPONE to coordinate meetings with HINTON to purchase controlled substances on May 24, 2024.

### *Emanuel PAYTON's Cell Phone Seizure*

18. On the same date, DEA investigators executed the federal arrest warrant for Emanuel PAYTON at his residence located at 147 Goffe Street, New Haven, CT. Upon the execution of that arrest warrant, agents conducted a search incident to arrest of PAYTON's person. Located in PAYTON's front pockets of his shorts was a black iPhone with no case (Exhibit N-41).

Investigators identified the seized phone as the PAYTON TELEPHONE by calling the PAYTON telephone number most recently, 203-974-9659, linked to PAYTON. The seized phone (Exhibit N-41) began to ring and displayed the incoming call. Additionally, after PAYTON requested a pair of shoes, investigators entered PAYTON's bedroom and retrieved a pair of sandals. Investigators observed in plain view, on top of PAYTON's bed, two cellphones: one black iPhone (Exhibit N-42) and one black TCL smartphone (Exhibit N-43) which were seized. Based on the clothing located in the bedroom being consistent with a male of PAYTON's stature, it appeared to investigators that PAYTON was the only person consistently staying in the bedroom. As relevant here, on May 10, 2024, PAYTON was arrested by local law enforcement after DEA had conducted surveillance on PAYTON meeting with HINTON and engaging in a suspected hand-to-hand drug transaction. *See* Original Affidavit at ¶¶ 137-140.   At the time of his arrest, officers searched his vehicle and found him to be in possession of three cell phones: two iPhones and a black TCL cellphone. *See* Original Affidavit at ¶ 142. I believe that the seized cellphones, Exhibits 41-43, are the same cellphones observed in PAYTON's vehicle at the time of his arrest. I know based on my training and experience and knowledge of this case that PAYTON is a drug trafficker. I also know that drug traffickers commonly maintain and utilize multiple cellphones to compartmentalize communications between customers, DTO members and sources of supply. Having a compartmentalized network allows a degree of security to traffickers in the event one of the cellphones is compromised or seized by law enforcement. PAYTON has utilized the PAYTON TELEPHONE as well as other predecessor telephones to contact HINTON to engage in drug trafficking activities, as previously described in the Original Affidavit. For example, on March 14, 2024 PAYTON and HINTON exchanged text messages coordinating a meeting for the sale of controlled substances. On this date, HINTON

10

mentions the "lab" and that he has various controlled substances for sale, including MDMA and Ketamine.

### *Shawn STEPHENS' Cell Phone Seizure*

19.    On the same date, DEA investigators executed the federal arrest warrant for Shawn STEPHENS inside the Krauszer's located at 377 Campbell Avenue, West Haven, CT. STEPHENS was searched incident to arrest and a black google smartphone was located on his person. Investigators confirmed the seized phone was linked to STEPHENS by calling the telephone number that was previously linked to STEPHENS, (203) 841-5291. This phone number was previously linked to STEPHENS after the May 10, 2024 Waterbury arrest, when, subsequent to arrest, STEPHENS called his mother, Denise Stephens. An administrative subpoena for phone records on the date and time STEPHENS called Denise revealed STEPHENS' phone number. Additionally, CashApp linked the STEPHENS phone number to a profile that displayed the user as "Shawn Stephens" with a cash tag of "$TheBat32." The seized phone began to ring and displayed the incoming call. I know, based on my training and experience as well as my knowledge of this case, that STEPHENS is a drug trafficker and assists HINTON with mailing dark web packages. I also know that STEPHENS would need to communicate on his cellphone with HINTON to coordinate those duties performed on HINTON's behalf. For example, and detailed fully in the Original Affidavit, STEPHENS was observed leaving HINTON's laboratory with weighted bags containing USPS parcels and delivering them to the post office at 50 Brewery Street, New Haven on August 16, 2024, August 23, 2024 and August 26, 2024.

*Arnaldo ECHEVARRIA's Cell Phone Seizure*

20.      On the same date, DEA investigators executed the federal arrest warrant for Arnaldo ECHEVARRIA at his residence located at 450 Hill Street Apt 10, Waterbury, CT.   Upon the execution of that arrest warrant, agents seized an iPhone with a black case. Investigators linked the seized iPhone to ECHEVARRIA by calling the telephone number that was previously linked to the ECHEVARRIA TELEPHONE, (203-598-8524). This phone number was previously linked to ECHEVARRIA by a public indices check. Additionally, CashApp linked the phone number to a profile that displayed the user as "Dk mino transporting LLC" with a Cash tag of "$Arnaldo1982." The seized phone began to ring and displayed the incoming call. Subsequent to arrest, ECHEVARRIA consented to a search of his cellphone and provided the PIN code. ECHEVARRIA signed a notice of rights form and a written consent form witnessed by investigators. As previously described in the Original Affidavit, ECHEVARRIA was arrested by Waterbury PD subsequent to a meeting with HINTON. ECHEVARRIA was arrested after investigators located and seized approximately 1,000 pills consisting of red, round tablets engraved M/10, blue tablets engraved M/15, suspected protonitazene. I know, based on my training and experience that the amount of pills seized was consistent with redistribution quantities of drugs. Further I know that the most common method of drug traffickers to coordinate the transactions and meetings with their customers is via cellphone. During ECHEVARRIA's Waterbury arrest on July 31, 2024, investigators observed the same cellphone in ECHEVARRIA's possession but did not seize the cellphone.

21.      For those same reasons, as set forth in greater detail below, there is probable cause to believe, and I do believe, that evidence of HINTON, HARRIS, PAYTON, STEPHENS and ECHEVARRIA committing the Charged Offenses will be located within the TARGET DEVICES.

## **TECHNICAL TERMS**

22.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  <u>Wireless telephone</u>:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  <u>Digital camera</u>:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

13

c.  <u>Portable media player</u>:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  <u>GPS</u>:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  <u>PDA</u>:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access

14

the Internet and send and receive e-mail.    PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.    Removable storage media include various types of flash memory cards or miniature hard drives.    This removable storage media can store any digital data.    Most PDAs run computer software, giving them many of the same capabilities as personal computers.    For example, PDA users can work with word-processing documents, spreadsheets, and presentations.    PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

   f. <u>Tablet</u>:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.    Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.    Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.    Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

   g. <u>Pager</u>:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

   h. <u>IP Address</u>: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.    An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).    Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.    Most Internet service

providers control a range of IP addresses.   Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      i.  <u>Internet</u>: The Internet is a global network of computers and other electronic devices that communicate with each other.   Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

23.    Based on my training, experience, and research, I know, for example, that the TARGET TELEPHONES have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA, and will routinely be equipped with the capability of accessing the Internet.   In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

24.    Based on my knowledge, training, and experience, I know that electronic devices, such as each of the TARGET DEVICES can store information for long periods of time.   Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.   This information can sometimes be recovered with forensics tools.

25.    In addition, as to the TARGET LAPTOP, there is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

      a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.   Electronic files downloaded to a storage

medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

26. *Forensic evidence.* As further described in Attachments B-1 and B-2, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET DEVICE was used, the purpose of its use, who used it, and when. There is

probable cause to believe that this forensic electronic evidence might be on the TARGET DEVICE because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). With respect to the TARGET LAPTOP in particular, virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.   Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.   Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.   Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the

computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

28. Based on this information set forth in this affidavit as well as the Original Affidavit, I respectfully submit that there is probable cause to believe that TARGET PHONES and that the TARGET LAPTOP and TARGET THUMBDRIVES contain evidence of the Charged Offenses.

29. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

Respectfully submitted,

Andrew Pfeiffer
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on this _17th_ of September, 2024 in New Haven, Connecticut.

HONORABLE ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

20

## ATTACHMENT A-1

### Property to be Searched

The property to be search is (a)gray LG flip phone (Exhibit N-35), seized from HINTON's residence located at 55 Dewitt Street, New Haven, CT, on September 5, 2024; which is currently located at the DEA's non drug evidence vault.

## ATTACHMENT A-2

**Property to be Searched**

The property to be searched is a (b) dark gray TCL flip phone (Exhibit N-36), seized from HINTON's residence located at 55 Dewitt Street, New Haven, CT, on September 5, 2024; which is currently located at the DEA's non drug evidence vault.

## ATTACHMENT A-3

### Property to be Searched

The property to be searched is (c) black "Schok" smartphone (Exhibit N-37), seized from HINTON's residence located at 55 Dewitt Street, New Haven, CT, on September 5, 2024; which is currently located at the DEA's non drug evidence vault.

**ATTACHMENT A-4**

**Property to be Searched**

The property to be searched is (d) black "TCL" smartphone (Exhibit N-38), seized from HINTON's residence located at 55 Dewitt Street, New Haven, CT, on September 5, 2024; which is currently located at the DEA's non drug evidence vault.

## ATTACHMENT A-5

### Property to be Searched

The property to be searched is (e) gray "Samsung" smartphone (Exhibit N-39), seized from HINTON's residence located at 55 Dewitt Street, New Haven, CT, on September 5, 2024; which is currently located at the DEA's non drug evidence vault.

## ATTACHMENT A-6

### Property to be Searched

The property to be search is (f) black and silver Samsung folding smartphone (Exhibit N-40), seized from HINTON's residence located at 55 Dewitt Street, New Haven, CT, on September 5, 2024; which is currently located at the DEA's non drug evidence vault.

## ATTACHMENT A-7

**Property to be Searched**

The property to be searched is (g) black iPhone (Exhibit N-41), seized from PAYTON's residence located at 147 Goffe Street, New Haven, CT, on September 5, 2024; which is currently located at the DEA's non drug evidence vault.

## ATTACHMENT A-8

### Property to be Searched

The property to be searched is a (h) black iPhone (Exhibit N-42), seized from PAYTON's residence located at 147 Goffe Street, New Haven, CT, on September 5, 2024; which is currently located at the DEA's non drug evidence vault.

**ATTACHMENT A-9**

**Property to be Searched**

The property to be searched is (i) black TCL smartphone (Exhibit N-43), seized from PAYTONs residence located at 147 Goffe Street, New Haven, CT, on September 5, 2024; which is currently located at the DEA's non drug evidence vault.

**ATTACHMENT A-10**

**Property to be Searched**

       The property to be search is (j) black Google smartphone (Exhibit N-17), seized from the person of STEPHENS incident to his arrest at Krauzser's located at 377 Campbell Avenue, West Haven, CT, on September 5, 2024; which is currently located at the DEA's non drug evidence vault.

**ATTACHMENT A-11**

**Property to be Searched**

The property to be searched is (k) one black iPhone (Exhibit N-15), seized from ECHEVARRIA's residence located at 450 Hill Street APT 10, Waterbury, CT, on September 5, 2024; which is currently located at the DEA's non drug evidence vault.

**ATTACHMENT A-12**

**Property to be Searched**

The property to be searched is (l) iPhone with brown case (Exhibit N-20), seized from HARRIS's residence located at 539 East Street, New Haven, CT, on September 5, 2024; which is currently located at the DEA's non drug evidence locker.

## ATTACHMENT A-13

### Property to be Searched

The property to be searched is one red HP laptop, serial # CND1366HN, (Exhibit N-44), seized from HINTON's laboratory located at 34 Tyler Street, East Haven, CT, on September 5, 2024; which is currently located at the DEA's non drug evidence vault.

## ATTACHMENT A-14

### Property to be Searched

The property to be searched is one blue Sandisk thumb drive (Exhibit N-45), seized from HINTON's laboratory located at 34 Tyler Street, East Haven, CT, on September 5, 2024; which is currently located at the DEA's non drug evidence vault.

## ATTACHMENT A-15

### Property to be Searched

The property to be search is one black Samdata thumb drive (Exhibit N-46), seized from HINTON's laboratory located at 34 Tyler Street, East Haven, CT, on September 5, 2024; which is currently located at the DEA's non drug evidence vault.

## ATTACHMENT B-1

### (Target Phones)

### Particular Things to be Seized

All records, information, photographs, images, videos, call logs, contacts, text messages, internet browsing history, and calendars, in any format, including any associated metadata, as well as geo-location information, that constitute evidence of potential violations of Conspiracy to Manufacture, Distribute, and Possess with the Intent to Distribute Controlled Substances, including 50 Grams or More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B)(viii), (b)(1)(C), and 846 (the "Charged Offenses") for the time period of July 13, 2023 through September 5, 2024, including but not limited to the following:

a.  the telephone number, ESN number, IMEI number, other identifying number, serial number, and SIM card number of the TARGET PHONES;

b.  the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the TARGET PHONES;

c.  descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

d.  any and all records, however created or stored, which tend to demonstrate ownership and use of the TARGET PHONES, and identification bearing the name or photograph of any person, telephone books, address books, date books, calendars, personal files, and photographs of persons contained in the TARGET PHONES;

e.  any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the TARGET PHONES, such as passwords, sign-on codes, and program design;

f.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

36

     g.    saved searches, locations, and route history in the memory of the TARGET PHONES;

     h.    internet browsing history, to include, internet searches in the memory of the TARGET PHONES; and

     i.    images and videos in the memory of the TARGET PHONES.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described TARGET PHONES may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device/s.

It is further authorized that the officers executing this warrant may send the TARGET PHONES to a commercial vendor outside of Connecticut to permit the analysis called for herein.

**ATTACHMENT B-2**

**(Target Laptop and Target Thumb Drives)**

All property, records, and information in any format, which constitute evidence of the commission of one or more of the following criminal offenses, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing one or more criminal offenses, namely, Conspiracy to Manufacture, Distribute, and Possess with the Intent to Distribute Controlled Substances, including 50 Grams or More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B)(viii), (b)(1)(C), and 846 (the "Charged Offenses")

1. Records, information, and items relating to violations of the Charged Offenses, from the period of July 13, 2023 through September 5, 2024 in the form of:

    a. lists of customers and related identifying information;

    b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    c. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    d. any information related to the researching of chemical compounds, the scheduling of substances, including controlled substances, and the manufacturing of pharmaceuticals;

    e. all bank records, checks, credit card bills, account information, and other financial records.

2. For the devices whose search is otherwise authorized by this warrant, for the period of July 13, 2023 through September 5, 2024:

    a. Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs

and correspondence;

b. Evidence of how and when the device was used to create, edit, delete, view, or otherwise interact or engage in the things described in this warrant;

c. Records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

d. Passwords, encryption keys, and other access devices that may be necessary to access the device;

e. Records or information about the Internet Protocol addresses used by the device;

f. Documentation and manuals that may be necessary to access the device or to conduct a forensic examination of the device;

g. Evidence of computer programs (and associated data) that are designed to eliminate data from the device;

h. Evidence of using mobile banking applications, such as Cash App, to exchange money in connection with the Charged Offenses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information, and images contained in the Target Device described in Attachment A may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device/s.

To the extent that the Target Device contains removable storage media, examination of such removable media is specifically authorized for the same evidence as described in this

39

attachment.

## **ATTACHMENT C**

**"Original Affidavit"**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| IN THE MATTER OF APPLICATION FOR ARREST WARRANTS AND FOR SEARCH WARRANTS | Case No.

**Filed Under Seal** |

---

## AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS AND FOR COMPLAINTS AND ARREST WARRANTS

I, Andrew Pfeiffer, being first duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION AND AGENT BACKGROUND

1.      I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I am a Task Force Officer (TFO) and have been a TFO with the Drug Enforcement Administration (DEA) since April 2019. I have received DEA basic narcotic school training as well as specialized training in diversion investigations at the DEA Department of Justice Training Center at Quantico, Virginia, including the manner in which controlled substances are diverted, marketed, and consumed. I am currently assigned to the DEA's New Haven District Office, Tactical Diversion Squad (NHDO-TDS). As a TFO, my duties include investigating violations of the Connecticut General Statutes and the Controlled Substances Act, including but not limited to the diversion of controlled substances from legitimate medical channels. I also am a sworn police officer with the Hamden Police Department and have been employed as a certified police officer in the State of Connecticut since 2012. Prior to my current assignment, I was assigned to the Hamden Police Department Patrol Division where I investigated violations of the Connecticut General Statutes.

3.     As a law enforcement officer, I have conducted numerous investigations of violations of the law, which have led to arrests and convictions. I have coordinated controlled purchases of illegal drugs using confidential sources and cooperating witnesses. I have planned and participated in the execution of state and federal search warrants pertaining to individuals involved in the distribution of controlled substances, conducted electronic surveillance and physical surveillance of individuals involved in the distribution of controlled substances, analyzed records documenting the purchase and sale of illegal drugs, and spoken with informants and subjects, as well as other local, state, and federal law enforcement officers, regarding the manner in which narcotics traffickers obtain, finance, store, manufacture, transport, and distribute illegal drugs.

4.     I submit this affidavit in support of a criminal complaint and application for arrest warrants charging the following individuals with federal narcotics trafficking offenses:

    a.  KELLDON HINTON, for Conspiracy to Manufacture, Distribute, and Possess with the Intent to Distribute Controlled Substances, including 50 Grams or More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B)(viii), (b)(1)(C), and 846; and

    b.  HESHIMA HARRIS, EMANUEL PAYTON, SHAWN STEPHENS, and ARNALDO ECHEVARRIA for Conspiracy Manufacture, Distribute, and Possess with the Intent to Distribute Controlled Substances in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C) and 846.

5.     In addition, I submit this affidavit in support of applications for search warrants for the following locations: 34 Tyler Street Extension, East Haven, CT ("TARGET LOCATION 1"); 55 Dewitt Street, New Haven, CT ("TARGET LOCATION 2"); and one 2023 Gray Chevy Malibu bearing NY marker plate LJX9536 ("TARGET VEHICLE 1").

6.     This affidavit with respect to the Target Locations and Target Vehicle is made in support of applications for a search warrant under Rule 41 of the Federal Rules of Criminal

Procedure to search each of the Target Locations and the Target Vehicle, further described in each respective Attachment A, for evidence of Manufacturing, Distributing or Dispensing, or Possessing with the Intent to Manufacture, Distribute or Dispense a Controlled Substances and Conspiracy to do the same in violation of Title 21, United States Code, Sections 841(a)(1) and 846 (collectively, the "Target Offenses") and for contraband, fruits of crime, and property used in committing the Target Offenses, as set forth more particularly in Attachment B, including but not limited to quantities of controlled substances, drug paraphernalia, drug packaging materials, cash deriving from the sale of drugs, bank records, business receipts, and invoices and/or documents and records relating to the Target Offenses, including records stored in electronic form.

7.      The facts in this affidavit come from my personal observations, my training and experience, and my conversations with Special Agents and Task Force Officers. This affidavit is intended to show merely that there is probable cause for the requested criminal complaints, arrest warrants and search warrant and does not set forth all of my knowledge regarding this matter.

8.      The investigation has employed several different investigative techniques, including, but not limited to: the gathering of intelligence from reliable cooperating sources; the examination of records, including call detail records and motor vehicle records; the use of pen registers; the obtaining of precise location information; physical surveillance and the use of pole cameras; and controlled purchases of drugs.

## II.   **TARGETS OF THE INVESTIGATION**

9.      Agents and task force officers of the Drug Enforcement Administration (DEA) and the United States Postal Inspection Service (USPIS) currently are investigating Kelldon HINTON, Heshima HARRIS, Emanuel PAYTON, Shawn STEPHENS and Arnaldo ECHEVARRIA, and other individuals in connection with their manufacturing and distribution of wholesale quantities of counterfeit Oxycodone, Xanax, and Adderall tablets containing, among other things,

methamphetamine, Protonitazene, Dimethypentalone and Xylazine, in the greater New Haven area of Connecticut.[1]

A.    **Kelldon HINTON and Target Locations 1 and 2**

10.    On or about June 2023, DEA NHDO-TDS investigators received information from a Source of Information ("SOI") regarding a pill press operation being run by Kelldon HINTON (D.O.B. xx/xx/1978, known to me).   The SOI explained that HINTON was constantly in possession of "mounds" of "perc 30s" (Percocet 30mg) that the SOI had observed on a table in HINTON's residence at 55 Dewitt Street in New Haven ("TARGET LOCATION 2").   The SOI explained that the pills were fake pills actually pressed with fentanyl.  The SOI also explained that HINTON was shipping narcotics through the mail using the U.S. Postal Service.

11.    To corroborate the SOI's information, NHDO TDS began working with the United States Postal Inspection Service ("USPIS") to identify, seize and search parcels being sent to and from HINTON in furtherance of his counterfeit pill trafficking scheme.  In addition, NHDO TDS has been able to identify through physical and electronic surveillance, including pole cameras, the locations being utilized by HINTON in furtherance of his drug trafficking operation which include both TARGET LOCATION 2, and a large garage bay connected to a building located at 34 Tyler Street Extension in East Haven ("TARGET LOCATION 1").  Investigators have also been able to identify vehicles being used by HINTON to travel between these locations, including a 2023

---

[1] Protonitazene is a schedule I synthetic opioid with a potency that can be three times that of fentanyl. Dimethylpentylone is a synthetic opioid, that can also be three times more potent than fentanyl. Dimethylpentylone is not specifically listed in the US Controlled Substance Act but would be considered a schedule I as a positional isomer of the Schedule I substance N-Ethylpentylone. Xylazine, a.k.a. "Tranq," is not a controlled substance; however, it is a veterinary sedative not approved for human consumption that is commonly used as a cutting agent by drug traffickers to enhance the effects of the controlled substances with which it is mixed.

Chevy Malibu, color gray, bearing NY marker plate LJX9536 ("TARGET LOCATION 1"), as set forth in further detail below.

12.     In addition to HINTON's distribution across the United States via the mail, HINTON is the leader of a local distribution ring operating in the greater New Haven area, referred to herein as the HINTON Drug Trafficking Organization ("DTO"). Through physical and electronic surveillance, NHDO-TDS has been able to identify several individuals who appear to be redistributing various narcotics and other controlled substances for HINTON, including HARRIS, PAYTON, STEPHENS and ECHEVARRIA. Additionally, HARRIS and STEPHENS appear to be assisting HINTON in the managing of the DTO, with HARRIS receiving packages containing materials used in his pill pressing operations, and STEPEHNS mailing packages to suspected dark web customers on HINTON's behalf, as set forth in greater detail below.

13.     HINTON has been surveilled spending significant time at 34 Tyler Street Extension in East Haven ("TARGET LOCATION 1"), which investigators believe HINTON is using as a pill pressing location and distribution center for the DTO.  The property at 34 Tyler Street Extension is located on a dead-end road near the intersection of Hemingway Avenue and Tyler Street EXT. There is one main "T" shaped building. The bottom of the "T" is characterized by three attached garage bays. TARGET LOCATION 1 is the first garage bay closest to the top of the "T." This bay can be accessed through a door to the right of the bay.

14.     As set forth in greater detail below, investigators have observed HINTON at TARGET LOCATION 1 engaged in activities related to his drug trafficking activities, including possessing and operating at least one tableting machine, which was observed by investigators on March 9, 2024, *see* ¶ 76.  HINTON has also discussed his manufacturing of pills at this location, which he describes as his lab, in messages dated March 10, and March 12, 2024, *see* ¶¶ 81, 82.  In

addition, numerous co-conspirators have been surveilled meeting with HINTON at TARGET LOCATION 1 for the purpose of obtaining controlled substances, including PAYTON on March 14, 2024 and May 10, 2024, *see* ¶¶ 130-133; ECHEVARRIA on July 31, 2024, *see* ¶¶ 149-157, and STEPHENS on August 7, 2024, August 16, 2024, August 23, 2024, and August 26, 2024, who investigators observed leaving with large reusable tote bags containing suspected dark web packages, *see* ¶¶ 163-166, all of which is described in greater detail below.

15.     In addition, HINTON resides at 55 Dewitt Street, New Haven ("TARGET LOCATION 2") which is a two-story, single-family dwelling. TARGET LOCATION 2 is accessible through the white aluminum front door. A black plate with white numbers that identify the dwelling as "55." As set forth below, HINTON appears to be using TARGET LOCATION 2 for conducting meetings with his redistributors and providing them with suspected controlled substances, such as the meeting with HARRIS on May 24, 2024, *see* ¶¶ 117-121, and also is believed to be using it as an alternate stash location for controlled substances, such as suspected dark web customer packages that HINTON eventually transferred to co-conspirator STEPHENS on August 7, 2024 for delivery to the U.S. Post Office, *see* ¶¶ 85, 163.

16.     HINTON's telephone number has been identified by investigators to be 475-355-0907 (the "HINTON Telephone"). HINTON's telephone is serviced by Verizon Wireless and an administrative subpoena served on Verizon showed that the telephone is subscribed to HINTON. Investigators have confirmed HINTON's use of the above telephone number through pen register activity, text message content, and corresponding surveillance between HINTON and others, discussed below.

17.     HINTON has prior arrests dating back to 1997 and his most recent arrest was in 2019.   HINTON is a convicted felon, with prior offenses including Third-Degree Assault,

Burglary, Larceny, Strangulation, Possession of Narcotics, Threatening, Sale of Narcotics, and First-Degree Reckless Endangerment.

**B.**   **Heshima HARRIS**

18.      Heshima HARRIS (D.O.B. xx/xx/1970, known to me) is involved in multiple levels of the HINTON DTO, including the procurement of bulk quantities of controlled substances from China, to be pressed into tablets at TARGET LOCATION 1, which are being first shipped to HARRIS's residence at 539 East St. Fl. 1 in New Haven, CT ("TARGET LOCATION 3"). Further, HARRIS has also attempted to procure other instrumentalities, such as pill punch die molds for HINTON, to replace older molds that succumb to wear and tear from extended use during the tableting process, as set forth below.  Investigators also believe that HARRIS redistributes to his own customer base. This belief is supported by text messages between HINTON and HARRIS. Physical surveillance on HARRIS also corroborated investigators' belief that HARRIS redistributes to his own customers as he was observed making suspected hand-to-hand transactions for unknown quantities of unknown controlled substances outside his residence, including on August 23, 2024, *see* ¶¶ 122-123.

19.      HARRIS' telephone number has been identified by investigators to be 203-508-2666 (the "HARRIS Telephone"). This number is subscribed to Winson HARRIS at 539 East St. Fl. 1 New Haven, CT.  CashApp linked the HARRIS Telephone to a profile that displayed the user as "Heshima HARRIS" with a Cash tag of "$HeshimaHARRIS."

20.      HARRIS has prior arrests dating back to 1988 and his most recent arrest was in 2011. HARRIS is a convicted felon with offenses including but not limited to Robbery 1st Degree, Possession with Intent to Sell, Criminal Possession of Gun, Assault 3rd Degree, Larceny 3rd Degree, Possession of Narcotics, Escape 1st Degree.

**C.**   **Emanuel PAYTON**

21.     Emanuel PAYTON (D.O.B. xx/xx/1990, known to me) is a trusted member of the HINTON DTO. PAYTON has been observed on physical surveillance distributing controlled substances sourced from HINTON at TARGET LOCATION 1. Investigators also know that during PAYTON's frequent visits he will, at times, remain at TARGET LOCATION 1 for hours. Based on the cumulative knowledge of TARGET LOCATION 1, garnered from multiple investigative tools and my training and experience, as set forth in greater detail below, I believe PAYTON assists HINTON with the dark web distribution of the DTO. This belief is supported by surveillance of PAYTON, described more fully below, at TARGET LOCATION 1, carrying a small laptop computer and remaining inside for approximately 5 hours, *see* ¶¶ 135, 136. Additionally, the same laptop was with PAYTON during a West Haven motor vehicle stop, when PAYTON was arrested for possession of controlled substances following a meeting with HINTON, *see* ¶ 144.

22.     PAYTON's telephone number has been identified by investigators to be 475-355-9546 (the "PAYTON Telephone"). Investigators confirmed through the use of an administrative subpoena to Verizon Wireless that the PAYTON Telephone is subscribed to Emauel Eayton 147 Gold St. Hamden, CT. Investigators have confirmed PAYTON's use of the above telephone number through pen register activity, text message content, and corresponding surveillance between PAYTON and HINTON.

23.     PAYTON has prior arrests dating back to 2008 and his most recent arrest was in 2023. PAYTON is a convicted felon, with prior offenses including but not limited to Possession Narcotics with Intent to Sell, Sale of Narcotics, and Criminal Possession of a Weapon.

**D.    Shawn STEPHENS**

24.     Shawn STEPHENS (D.O.B xx/xx/1990, known to me) is a trusted member of the DTO. STEPHENS has been routinely observed at TARGET LOCATION 1 and believed to be

assisting HINTON with the manufacture of controlled substances. STEPHENS has also been observed transporting parcels from TARGET LOCATION 1 to the U.S. Post Office at 50 Brewery Street, New Haven where he mailed them on HINTON's behalf in August 2024. USPIS seized several parcels that were found to contain various pressed pills.

25.    STEPHENS has prior arrests dating back to 2010 with his with the most recent arrest was in 2015. STEPHENS is a convicted felon, with prior arrests including but not limited multiple weapon offenses and assault.

### E.    Arnaldo ECHEVARRIA

26.    Arnaldo ECHEVARRIA (D.O.B xx/xx/1982, known to me) is believed to be a high quantity drug redistributor sourcing from the HINTON DTO, as evidenced by his possession of approximately 1,000 pills containing suspected Protonitazene on July 31, 2024, discussed below. ECHEVARRIA has prior arrests dating back to 2010 and his most recent arrest was in 2024. ECHEVARRIA is a convicted felon, with offenses including but not limited to drug sale, possession with intent to sell, burglary and domestic charges.

### III.    PROBABLE CAUSE

27.    As set forth above, in or about June 2023, DEA NHDO-TDS investigators received information from a SOI about HINTON running a counterfeit pill press operation and was distributing those pills to customers through the mail using the U.S. Postal Service. To corroborate this information, NHDO TDS began working with USPIS to identify, seize and search parcels being sent to and from HINTON in furtherance of his counterfeit pill trafficking scheme.

### A.    HINTON's Distribution of Drugs Through the U.S. Mail

28.    Over the course of this investigation, HINTON has been observed on numerous occasions transporting parcels from TARGET LOCATION 1 to the U.S. Post Office at 50 Brewery Street in New Haven for mailing. On those days, HINTON was routinely surveilled by

investigators leaving TARGET LOCATION 1 carrying large, reusable shopping bags, filled with USPS flat rate shipping boxes, loading them into the trunk of his vehicle and taking them to the Post Office. HINTON would then place the parcels into the blue mail bins outside the post office, or carry them inside and deposit them into the bins located in the lobby. As set forth below, investigators were able to seize and search several of those packages, finding inside a variety of controlled substances, including Protonitazene, Cocaine, and Methamphetamine.

29.     Investigators were able to readily identify HINTON's mailings from others by recognizing certain return addresses habitually used by HINTON, discussed below. The USPIS conducted a review of HINTON's mailing statistics. The review showed that HINTON routinely uses two return addresses: Grand Beauty Supply 276 Grand Avenue, New Haven and Sargent Manufacturing 100 Sargent Drive, New Haven, CT. From the time period of February 2023 and February 2024, USPIS records show HINTON mailed 1,330 parcels to numerous addresses all over the United States. Throughout this investigation HINTON maintained his pattern of using a number of different return address as a tactic to avoid law enforcement detection by introducing new return addresses.

### i.    The August 14, 2023 Package

30.     On August 14, 2023 at approximately 4:30 PM, Postal Inspectors reviewed their camera footage from the Post Office located at 50 Brewery St., New Haven, CT. It revealed HINTON walking in the lobby of the Post Office with a gray and red, re-usable Target bag. He walked to the Parcel Box and removed several small USPS Priority Parcel boxes from the bag and handed them to the Postal worker who was at the Parcel box at the time.

31.     One of those packages, with a return address of "Grand Beauty Supply LLC, 276 Grand Ave., New Haven, CT 06513" was later seized by Postal Inspector Maynard and a search and seizure warrant was authorized by the Hon. Robert A. Richardson, U.S.M.J.  Inside the

package, investigators located a USPS priority express envelope which contained a small zip lock bag containing 100 blue pills. A sample of a blue pill was field tested and showed a positive reaction for the presence of Fentanyl. The pills were inscribed with "M" and "30" on each pill.

32.     The pills were laboratory tested and found to contain Protonitazene, a Schedule I synthetic opioid with a potency three times that of fentanyl.

### ii.    The August 23, 2023 Package

33.     On August 23, 2023, investigators observed HINTON depart his residence at TARGET LOCATION 2 and travel to TARGET LOCATION 1.  Upon exiting the vehicle, HINTON briefly opened and then closed the front hood of the vehicle.  He then walked into the garage through a breezeway door located between the business and the garage bay area.

34.     I know through my training and experience that individuals in possession of narcotics, including people dealing in narcotics, often attempt to hide narcotics in the vehicle's air box or other compartments under the hood near or in the motor to elude police detection.  In this case, the timing and nature of HINTON's movements appeared to be consistent with him removing something small from the front hood of the vehicle and carrying it into the garage building, possibly a quantity of narcotics.

35.     Approximately one hour later, HINTON was observed exiting the garage of TARGET LOCATION 1 holding an object in his hand, consistent with a small package.  HINTON then entered his vehicle and departed the location.  Investigators were able to conduct moving surveillance on HINTON as it proceeded to the parking lot of the U.S. Post Office at 50 Brewery Street in New Haven.

36.     On August 24, 2023, Postal Inspector Maynard reviewed the recorded surveillance video footage from August 23, 2023 from the lobby of the U.S. Post Office at 50 Brewery St.  It showed HINTON entering into the post office lobby carrying what appeared to be one white USPS

Priority Parcel box in his right hand while on his cellphone and walking towards the blue postal lobby collection box. After placing the USPS Priority Parcel box into the blue postal lobby collection box, HINTON then walked out of the post office with more empty USPS Priority Parcel boxes.

37.    Thereafter, Inspector Maynard contacted USPS personnel and requested that the parcel mailed by HINTON be recovered from the New Haven collection box and provided to the USPIS. The parcel was a small Priority box displaying USPS Tracking Number 9405 5361 0544 0257 6066 17 addressed to "Beecher Shuler, 5267 Irwin Road, #1A, Huntington, WV" and with a return address of "Grand Beauty Supply LLC, 276 Grand Avenue, New Haven, CT."

38.    The parcel was opened pursuant to a federal search warrant issued by the Honorable Robert A. Richardson, U.S.M.J. on August 25, 2023. Inside the parcel, investigators located a rolled-up Priority mail envelope further containing a clear heat-sealed bag. Inside of the clear heat-sealed bag was the following:

a.    One small clear zip lock baggie containing a white powdery substance which field tested positive for the presence of cocaine and laboratory test results showed the powder to contain cocaine;

b.    One small clear zip lock baggie containing numerous yellow oval pills marked with "PERCOCET" on one side and "10" on the other total approximate weight 46.2 grams which laboratory results show contained Protonitazene and Xylazine;

c.    One small zip lock baggie containing a yellow powder substance with an inconclusive field test and no laboratory results yet;

d.    One clear sandwich bag with a tied knot at the end containing numerous white rectangle pills marked "XANAX" with an approximate weight of 20.3 grams, for which no laboratory tests have been received yet; and

e.    One clear sandwich bag with a tied knot at the end containing numerous yellow rectangle pills marked "R039" with an approximate weight of 30 grams, for which no laboratory tests have been received yet.

### iii.    Additional Parcel Seizures

39.    The DEA's investigation has resulted in numerous additional seizures of parcels mailed from New Haven that appear related to the distribution of counterfeit pills by HINTON. These parcels were attributed to HINTON when investigators recognized several identifiers. These identifiers included the previously mentioned return addresses previously used by HINTON in the past, Grand Beauty Supply LLC and Sargent Manufacturing. Both Grand Beauty Supply LLC and Sargent Manufacturing appear to be legitimate businesses with mailing addresses in New Haven, CT. However, as set forth below, representatives from these companies have confirmed that packages containing controlled substances intercepted by the U.S. Postal Service utilizing their addresses are not associated with their business or employees. In addition, the third-party cryptocurrency, pre-paid postage on the parcel is another HINTON identifier. As previously mentioned, traffickers use this tactic to minimize the chance of having their shipping habits scrutinized by USPS employees by foregoing the need to have a face-to-face encounter.

40.    For example, on August 21, 2023, Postal Inspector Geoff Maynard was alerted to a parcel in the custody of Sargent Manufacturing that had been mailed to an address in North Carolina and then "returned to sender" due to an insufficient address. Although the parcel utilized a return address of Sargent Manufacturing, the parcel remained in Sargent Manufacturing's mail room unclaimed for several days. A representative from Sargent Manufacturing turned the package over to investigators and explained that the parcel was partially opened upon entering the mailroom. The partial opening revealed a small zip locked bag that had been packaged inside another Priority Express envelope inside of a small Priority mailer. DEA investigators took custody of the small zip locked bag and found it to contain several round, orange colored counterfeit pressed Adderall pills marked "AD 30" which field tested positive for the presence of methamphetamines. On August 30, 2024, members of the DEA TDS acquired the seized parcel,

transported them to the New Haven District Office where it was processed as evidence and sent to the New England Laboratory for analysis. Laboratory results showed that the pills contained methamphetamine.

41.     Similarly, Postal Inspector Maynard also became aware of a similar incident at the Fairhaven Post Office on Grand Avenue in New Haven.  Specifically, on August 22, 2023, a representative from Grand Beauty Supply came into the post office and turned over a package that had been received by the company as being "returned to sender."  According to the owner of Grand Beauty Supply, she had received the package in the mail, even though she was not expecting anything.  She observed the package had a return address of Grand Beauty Supply, so she opened it and found a bag of pills.  She immediately took the package and the pills to the post office, where she reported the incident to a post office representative.  DEA investigators took custody of the package and its contents, including approximately 7.8 ounces of round, orange, counterfeit Adderall pills marked "AD 30" which field tested positive for the presence of methamphetamines.

42.     The USPIS conducted a review of mailing statistics associated with both Grand Beauty Supply and Sargent Manufacturing that investigators believe are attributable to HINTON, as set forth above. The review showed that from the time period of February 2023 and February 2024, USPIS records show HINTON mailed approximately 1,330 parcels to numerous addresses all over the United States using either of these two return addresses. The parcels referenced above were all mailed utilizing cryptocurrency pre-paid postage. Additionally, Investigators spoke with representatives from Sargent Manufacturing and Grand Beauty Supply who indicated these types of parcels were not mailed by the businesses.

43.     Investigators also repeatedly surveilled HINTON at the New Haven Post Office at 50 Brewery Street carrying large reusable shopping bags filled with many USPS flat rate shipping

boxes. HINTON was recorded on CCTV cameras as he mailed them to his customers. Some of these parcels were seized from the mail stream and searched pursuant to warrants. The parcels were found to contain pressed pills and other controlled substances. For example, during the summer and fall of 2023, USPIS and TDS members seized five parcels that, in all, were found to contain 600 fake Adderall tablets containing methamphetamine, 195 fake hydrocodone tablets containing Protonitazene, 146 fake Oxycodone tablets containing Protonitazene, and 53 fake Percocet tablets containing Protonitazene and Xylazine. These samplings offer strong indication to the contents of the other parcels mailed by HINTON.

44.     More recently, HINTON has also been using STEPHENS to deliver parcels containing controlled substances to the U.S. Post Offices for mailing, including on August 7, 2024 and August 26, 2024, as set forth in greater detail below.

**B.      HINTON Distributing Controlled Substances on the Dark Web**

45.     Based on my training and experience and on information provided by reliable law enforcement sources, I know that individuals involved in the trafficking of illicit drugs are increasingly using Dark Network Markets ("DNMs") to distribute and purchase narcotics and materials used to manufacture narcotics. The "Dark Network" refers to any portion of the Internet that can be accessed only with specific software, configurations or authorization. People who access the Dark Network use a series of sites that anonymize their internet traffic, thereby making it difficult for law enforcement to track them via an Internal Protocol address. To further criminal activities, those distributing illicit goods, including narcotics, have established websites on the Dark Network, known as DNMs, on which they advertise and sell the illicit materials.

46.     Pretty Good Privacy (PGP) is an encryption program that provides cryptographic privacy and authentication for data communication. PGP is used for signing, encrypting, and decrypting texts, e-mails, files, directories, and whole disk partitions and to increase the security

of e-mail communications. PGP can be used to send messages confidentially. For this, PGP combines symmetric-key encryption and public-key encryption. The message is encrypted using the sender's private encryption key and the sender's public encryption key. The message is sent to the receiver. The receiver then uses their private encryption key and the sender's public key to decrypt the message. Only the private key belonging to the receiver can decrypt the session key. I know based on my training and experience that DNM vendors often use PGP to encrypt their communications with co-conspirators, sources of supply, and customers.

47.    Based on my training and experience and on information provided by reliable law enforcement sources, I know that individuals involved in the trafficking of illicit drugs related to DNM illegal activity often take advantage of the anonymity of enhanced crypto-currencies such as Bitcoin. These digital currencies can be held in "Wallets." A crypto-currency wallet is a software program where crypto-currencies are stored. Crypto-currency wallets facilitate sending and receiving crypto-currency and gives ownership of the balance to the user. There are many different types of crypto-currency wallets which can either be hosted online by a company such as CoinBase, on a software program such as Elecrum or Jaxx, or a hardware device such as a Trezor or Nano Ledger.

48.    I know based on my training and experience that DNM vendors often need to exchange the crypto-currency (e.g. Bitcoin) proceeds of their illicit activity into fiat currency, which is tangible currency, such as U.S. Dollars. DNM vendors use various methods to exchange currency, including online marketplaces and peer-to-peer exchanges. They are marketplaces where users can buy and sell items, including Bitcoins, to and from one another. Among the possibilities using these services is trading Bitcoin for fiat currency, prepaid gift cards, reloadable debit cards, and jewelry.

49.     Based on my training and experience and on information provided by reliable law enforcement sources, I also know that DNM Vendors often use third-party postage services to add additional layers of anonymity to their transactions. These services allow their customers to purchase postage using crypto-currency. As set forth below, investigators have intercepted numerous packages containing controlled substances dispatched via the U.S. Mail suspected to be shipped by HINTON using these types of services.

*i.      HINTON's Dark Web Vendor Accounts*

50.     During the course of this investigation, DEA Chicago Cyber Task Force, DEA New Haven TDS and USPIS were able to make controlled purchases of counterfeit pressed pills from a dark web vendor named ███████████ which investigators were able to confirm is being operated by the HINTON DTO.

51.     On or about July 25, 2023, Investigators from the DEA Chicago Cyber Task Force conducted an undercover purchase from a vendor known as ███████████ on the Nemesis Dark Net Marketplace ("DNM"). Investigators placed an order for 500 Oxycodone "M30" pills 0.0279259 BTC, approximately $817 USD, for 500 oxycodone "M30" pills from ███████████ Investigators received the undercover purchase on or about August 1, 2023. The package had a return address of, "Grand Beauty Supply LLC, 276 Grand Avenue, New Haven, CT 06513." The package was sent USPS Priority Mail with a tracking number of 9405 5361 0544 0141 8251 86. The package contained small round blue colored tablets imprinted with "M" "30." Based on a comparison of the package and its contents to the packages seized after being dropped of by HINTON at the U.S. Post Office discussed above, including the misuse return address of "Grand Beauty Supply LLC," investigators believe that ███████████ is being operated by HINTON.

52.     Investigators from the DEA Chicago Cyber Task Force also informed the DEA New Haven TDS that the dark web vendor ███████████ and dark web vendor ██████ were

most likely being operated by the same organization. Investigators based this belief in part on the similarities between both vendor pages to include product/drug listings, photographs of products/drugs, shipping options, and customer reviews. Additionally, investigators observed a plethora of negative reviews on the ████ vendor page regarding the potential vendors scamming purchasers due to shipping issues. For example, investigators observed ████"
respond to one review stating, ████████████████████████

████████████████████████

████████ I believe that the ████ response to the above review in his own words linked both vendor accounts ████ and ████.

53.    Additionally, on the ████ Nemesis vendor page "about me" section, ████ posted the following about customer complaints related to shipping delays. ████

████████████████████████

████████████████████████

████████

███ Investigators also observed an additional paragraph on the "about me" page which appeared to provide context to the original forum post noted above. "WE HAVE A WELL TRAINED CHEMIST WHO DOES ALL THE MIXING WITH VERY EXPENSIVE INGREDIENTS TO MAKE SURE WE COME OUT WITH THE BEST AND TOP RESULT. WE ARE BACK WITH THE CAPABILITY AND POSSIBILITY OF PRESSING OUR OWN PILLS WITH THE CAPACITY OF PRESSING 110,000 PILLS PER HOUR SO RIGHT NOW WE ARE VERY READY TO GO!!!!"    Investigators believe that that above post by ████ is referring to the pill pressing capability of a ZP33 pill press, that investigators believe is in the possession of HINTON, as set forth in greater detail below.

55.     Investigators were further able to corroborate that HINTON was operating the ███████████ and ███████ dark web vendor accounts by comparing certain images of pills, equipment, and background in the images posted by ███████ on the vendor page and certain items that were readily connected to HINTON's pressing location at TARGET LOCATION 1. Specifically, the ███████ vendor page included images of a TDP 5 Style pill press dispensing pills into an orange paint roller tray, which was observed by investigators during a garbage seizure at TARGET LOCATION 1 on August 8, 2023, as discussed in greater detail below. In addition, the vendor page also included images of a blue Walmart bag and red and gray Target bag that appeared to be full of preposted USPS parcels placed into a vehicle. HINTON and a co-conspirator have both been observed using these types of bags to specifically transport USPS parcels from TARGET LOCATION 1 to the Post Office for delivery.

56.     In addition, during each of the two controlled purchases from the ███████████ vendor page described below, the resulting packages contained the same hallmarks as the packages seized by USPIS above that were deposited into the U.S. Mail by HINTON during physical surveillance, including: various sized flat rate USPS boxes, return addresses in New Haven, CT, and pre-paid cryptocurrency postage. HINTON consistently uses the 50 Brewery St. New Haven, CT Post Office to mail packages.

57.     In addition, investigators were able to subpoena records for any accounts being operated by HINTON from Coinbase, a secure, online platform for buying, selling, transferring and storing cryptocurrency. Based on my training and experience, I know that to maintain anonymity, all transactions on the dark web are conducted with cryptocurrency such as Bitcoin. The dark web marketplaces will utilize escrow accounts to hold payments until purchases have been marked as "shipped" by the vendor and finalized from the buyer, i.e, "received." Once that

step is complete, the marketplace will disperse the cryptocurrency to the vendor. By having a Coinbase account, HINTON would be able to receive payments for anything sold on the ████████████ or vendor page. Records from Coinbase revealed that HINTON has multiple Coinbase accounts. Notably, Coinbase records indicate that HINTON's account with user ID 16db is held in the name of Kelldon HINTON at 55 Dewitt St. New Haven, CT. The account was opened in July of 2018 and lists two telephone numbers for HINTON as 475-355-1439 and 475-355-0907 (the "HINTON Telephone"). Since the time of the investigation HINTON's account has received approximately $30,000 USD from various Dark Web marketplaces to include Abacus, Incognito, and Torzon. Investigators know that HINTON was vending narcotics utilizing the ████████████ and ████████ moniker on multiple marketplaces. The Coinbase records indicate that over the course of the investigation HINTON has transferred approximately $57,135.59 from Coinbase - 1d6b into HINTON's Bank of America personal account.

### ii.   *Dark Web Purchase of Counterfeit Adderall Tablets Containing Methamphetamine*

58.     On October 2, 2023, USPIS received authorization to conduct an online undercover purchase from the ████████████ vendor account on the ██████████████████████ ("DNM").

59.     Investigators conducted the transaction on October 12, 2023 by logging into the Nemesis DNM using a previously created undercover account. Investigators navigated to the profile for the vendor known as ████████████ observed that the vendor had various products available for purchase including but not limited to Oxycodone and Adderall tablets in various Milligrams and quantities. Investigators selected the listing for 100 "Quality pressed Adderall B974 US2US (Free shipping)," with a price listed as "$172.2." According to the listing, the Bitcoin (BTC) price for this listing was 0.00646899BTC. Investigators noted the only shipping option available was USPS Priority Shipping 2 day and clicked the "Add to Cart" button. The order total

in the cart reflected 0.00646899BTC.

60.     Investigators then clicked the "Continue to checkout with Bitcoin" button and transferred 0.00646899BTC (approximately $172.15 worth of BTC), plus a fee of .000036BTC (approximately $0.96) from the undercover cryptocurrency wallet to the marketplace wallet. The deposit was successful, and investigators returned to the cart and confirmed the order.

61.     On October 14, 2023, investigators logged back into the Nemesis DNM and observed that the order status for this order had been updated, and that the order had been accepted by the vendor ▇▇▇▇▇▇▇▇ on October 13, 2023.

62.     On October 23, 2023, investigators learned that that the parcel was deposited into the U.S. mail and was intercepted by USPIS agents. Within the box, USPIS agents located approximately 53 grams of counterfeit Adderall which field tested positive for methamphetamines. This parcel was mailed using the return address of "GRAND BEAUTY SUPPLY LLC, 276 GRAND AVE, NEW HAVEN, CT 06513."

### iii.    Dark Web Purchase of Suspected Counterfeit Oxycodone Tablets

63.     On November 15, 2023, USPIS agents logged into the ▇▇▇▇▇DNM using an undercover account. USPIS agents again navigated to the product offering page of the vendor ▇▇▇▇▇▇▇ and observed a listing titled, in part, "X500 M30 Blues smokable oxy US to US." USPIS agents noted that the price was listed as $1,800.00, which at the time of the screenshot was equivalent to 0.04997900BTC. Although the listing advertised free shipping, there was a charge of $17 for USPS priority mail shipping. The product description stated that the pills were "30mg quality press" and they were "pressed with Isotonitazene (Zero fent / Zero meth)."

64.     USPIS agents submitted the order for which the total cost was 0.04993263BTC. USPIS agents provided the vendor with encrypted shipping information.

65.    Between November 26, 2023, and December 19, 2023, after not receiving the product, USPIS agents logged back into the Nemesis DNM multiple times to request status updates and to dispute the transaction. USPIS agents also contacted the ████████ Support team about the order. Eventually on or about December 17, 2023, the vendor ████████ provided the tracking number 9405 5362 0624 8919 3537 98.

66.    On December 27, 2023, USPIS agents opened the Subject Parcel at the New Haven domicile. USPIS agents found the Subject Parcel to be a USPS Priority Mail Small Flat Rate Box bearing the return address "GRAND BEAUTY SUPPLY LLC, 276 GRAND AVE, NEW HAVEN, CT 06513" and tracking number 9405 5362 0624 8919 3537 98. This parcel was mailed utilizing cryptocurrency which matches the pattern of previously mailed parcels by the HINTON DTO. Within the box was a brown paper bag. Within the brown paper bag, USPIS agents located a sandwich sized, clear, zip-top bag containing approximately 75 grams of round green tablets stamped with the letter "M" on one side and "30" on the reverse side. The pills have been sent to the laboratory for analysis but appear to be similar in size, stamping, color, and quality as other pills seized from the HINTON DTO that have contained controlled substances.

### C.    HINTON's Pill Pressing Operations at Target Location 1

67.    Early in the investigation, CBP/HSI seized a parcel containing pill punches and die molds being sent to one of HINTON's co-conspirators, Heshima HARRIS, discussed below, which strongly indicated to investigators that HINTON was in possession of a ZP33 tableting machine. This seizure, connected with physical surveillance, has led investigators to believe that HINTON is maintaining and operating an active pill pressing operation within TARGET LOCATION 1. This belief is also supported by specific indicators of an active pressing location. For example, a suspected tableting machine was observed during surveillance at TARGET LOCATION 1, consistent with images posted to HINTON's suspected dark web vendor page, discussed below.

In addition, on multiple occasions HINTON was observed briefly opening the garage door partially to vent heat from inside while also obscuring the view into the garage from the outside. HINTON has also been observed, on multiple occasions, using a leaf blower at TARGET LOCATION 1 to remove large amounts of white powder from within the garage. Based on my training and experience, I know that large amounts of excess powder as well as the excessive heat buildup are byproducts of an active pill pressing operation. Specific examples are included below.

### i.   *August 8, 2023 Trash Pull*

68.    On August 8, 2023 investigators reviewed the live footage from the electronic pole camera that was recording the area of TARGET LOCATION 1.  At this point in the investigation, case agents knew HINTON was using the first garage bay adjacent to the breezeway door to the right of the garage bay of this address and had seen him enter and exit the same garage door on many occasions. In addition, agents had also established that  HINTON typically arrived in his vehicle and parked in the same area in front of his designated garage.

69.    At approximately 8:30PM, while reviewing the live camera feed, investigators observed HINTON's garage door was being opened and an interior garage light illuminated the space inside. While the garage door went up, the interior light turned off. Investigators observed a black male, believed to be HINTON, exit the garage door carrying a large black trash bag in one hand and a light-colored trash bag in the other. HINTON walked towards the end of the driveway out of view from the camera, then re-appeared shortly after with nothing in his hands and entered back into the garage then closed the door.

70.    Surveillance was established in the area of TARGET LOCATION 1 and observed several garbage bags at the curb. The same evening, at approximately 10:30 PM investigators retrieved four garbage bags from within a pile of trash at the curb in front of TARGET LOCATION

1, two of which appeared to be consistent with the bags that HINTON had been seen placing in the pile, including one light and one dark trash bag.

71.    The garbage bags were photographed prior to opening. Once the photographs were completed, a systematic search was completed. Two of the black garbage bags were discarded after they were linked to other tenants in the area based on their contents. Based on the contents within the remaining black bag with blue draw strings and the white bag, investigators were able to identify the seized bags to those bags that HINTON brought to the curb. Items of evidentiary value were segregated from other items such as food waste and packaging. Items of evidentiary value included: (1) one brown USPS shipping box addressed to Cheryle Tyson at 67 Ellsworth Street, West Haven, CT from an address in mainland China; (2) one USPS Priority Mail Shipping label to J Thomas, 3770 Vermont St. Apt. B, San Diego CA 92103 from Grand Beauty Supply LLC, 376 Grand Ave., New Haven, CT 06513; (3) used surgical gloves; (4) an orange plastic paint roller tray, and the following items:

- "Dasher Products" brand wrapper, and several zip lock style and sandwich baggies with an unknown residue labeled with but not limited to "white ISO 2mg mix," "1000," "white ISO," "New 20s," "Ace," "RP10 Acetiminophen," "RP15 100g Ace," and "ACE."

- "Dasher Products" brand wrappers, several zip lock and sandwich style baggies with an unknown residue labeled with but not limited to "A215," "ADDIES 10H," "5," and "15."

- One (1) small glycine bag containing one, round, white tablet stamped "M" / "05-52", suspected to contain Fentanyl. Laboratory results confirmed the pill to contain protonitazine.

- Two (2), round, yellow tablets, marked "C" / "230", suspected to contain Fentanyl. Laboratory results confirmed the pills to contain protonitazine and methamphetamine.



*Figure 1: Photos taken from trash pull at Target Location 1 on August 8, 2023*

72.    The case agents have extensive experience with identifying illicit clandestine laboratories, which routinely involve illicit counterfeit pill press operations. These operations can vary in complexity and involve the mixing and milling of various powders, to include active and inactive substances. Further, pill press operations with electronic pill press machines are designed to process large kilogram quantities of powders. These mixing and milling operations involve various containers and packaging materials similar to those identified from HINTON's trash.

73.    Investigators know through training and experience that drug traffickers commonly wear gloves when mixing cutting agents into narcotics, which results in greater total volume of product for distribution. Several of the plastic bags appeared to contain a white powdery residue. Investigators know through training and experience that drug traffickers often repackage kilogram quantities of narcotics into smaller quantities contained in small plastic bags which are more suitable for street level narcotic sales. Here, the handwritten labels on the plastic bags appear to

be consistent with the handwritten labels on other bags located within seized USPS parcels. Specifically, the number "5" and "1000" are the most striking examples of similar writing among the handwritten labels.

74.     In addition, the presence of a plastic, orange paint roller tray which is also observed in HINTON's dark web vendor page being used to catch pills being expelled from the press, along with the presence of the surgical gloves, the seized labeled bag, and several pressed tablets corroborates investigators' belief that HINTON is using TARGET LOCATION 1 in furtherance of his drug trafficking activity.

### ii.    Hinton's Possession and Use of Pill Press Machines

75.     In addition to storing and distributing controlled substances in TARGET LOCATION 1, Investigators also believe that HINTON is using TARGET LOCATION 1 to press the counterfeit pills that he is selling on the dark web, and to local redistributors and end customers. Tableting machines, regardless of model type, generally share similar components. A funnel is used to receive ingredients into the machine. These ingredients include binding agents that affect the consistency and color of the tablet as well as any active ingredient. Settings on the machine move a measured dose from the funnel to the die set. A die set includes components that shape and engrave the tablet with markings, specific to the die mold set.

76.     On March 9, 2024, during physical surveillance/electronic surveillance, Investigators were able to see, through an open garage bay door, what investigators know to be a TDP 5 style tableting machine. The machine was placed on top of a wheeled cart. This style of tableting machine is small enough to be placed on a table top and is characterized by a large round fly wheel and funnel. Based on my training and experience, I know that this type of machine is able to produce approximately 4,800-5,000 tablets an hour. One of HINTON's dark web vendor pages included an image of a TDP 5 style machine. The machine pictured was shown dispensing

pressed tablets into a plastic, orange paint tray. Investigators believe the pictured orange paint tray is the same plastic orange paint tray that was seized during the August 8, 2023 trash pull.



*Figure 2: Screenshot from* ▮▮▮▮ *taken on August 9, 2023*

77.    Investigators believe that HINTON is also in possession of a ZP33 model tableting machine. A ZP33 model is capable of producing approximately 100,000 tablets an hour. The ZP33 model achieves this high level of output by utilizing 33 die molds simultaneously on a rotary. I know through training and experience that die sets need to be replaced to change older molds that succumb to wear and tear from extended use during the tableting process. Investigators believe that HINTON attempted to replace the pill punch die molds of this ZP33 machine based on a July 27, 2023 HSI seizure of a parcel. Detailed more fully below, the seized parcel contained (4) sets of 33 die molds with engravings of highly sought after controlled substances. Additional confirmation of HINTON's possession of a ZP33 was made after viewing HINTON's dark web

vendor page, where he included an image of a ZP33 model machine dispensing tablets into a black

paint tray (pictured below). Described in full in a subsequent section of this affidavit.



*Figure 3: Screenshot of ZP33 machine from ███ page taken on August 9, 2023*

78.    Further, my belief that HINTON is operating two separate presses at TARGET

LOCATION 1 is also consistent with my training and experience that poly drug tablet traffickers

attempt to avoid cross contamination of their products. For example counterfeit Oxycodone tablets

generally contain an opiate, a sedative, while counterfeit Adderall tablets generally contain

methamphetamine, a stimulant. A product containing a sedative and a stimulant carries a greater

risk of overdosing a customer. HINTON's dark web postings advertise his products to be free of

such cross contaminations.

79.    Moreover, investigators received records from PayPal for account ending in 1257

in the name of Kelldon HINTON. The records indicated that on April 23, 2022, HINTON

purchased a TDP 5 spindle from Alibaba for a purchase price of $220.12. A TDP 5 spindle is a

metal threaded piece that holds the upper portion of the tool and die in place. Based on my training and experience I know that over time pill press machine parts degrade and require replacement. Additionally, the PayPal records indicate that on August 12, 2021, HINTON purchased a High Quality Mechanical Powder Mold for $87.55. Based on my training and experience, I believe the High Quality Mechanical Powder Mold is a replacement tool and die. On August 8, 2021, the PayPal records indicate that HINTON purchased Food Die E133 Brilliant Blue FCF Granular for $89.07. Based on my training and experience, I believe HINTON purchased blue colored food die to manufacture counterfeit pills being distributed by the HINTON DTO, specifically Oxycodone 30 MG tablets.

80.    Investigators observed other indicators of an active pill press at TARGET LOCATION 1. For example, on multiple occasions HINTON was observed briefly opening the garage door partially to vent heat from inside while also obscuring the view into the garage from the outside. HINTON has also been observed, on multiple occasions, using a leaf blower at TARGET LOCATION 1 to remove large amounts of white powder from within the garage. Large amounts of excess powder as well as the excessive heat buildup are byproducts of an active pill pressing operation. I believe that the partial opening of the garage bay door is an attempt by HINTON to conceal the garage contents from the view of passersby and from law enforcement. The tableting machines in HINTON's possession are large—for example, the ZP33 model is roughly 3'x 3' x 5' and weights approximately 1000 lbs. A ZP33 and the accessory equipment is not easily concealable within a garage. Further, I know, based on training and experience, that the operation of a pill press generates a large amount of heat and excess powder. The combination of the two necessitates ventilating of the pill press location. When HINTON partially opens the garage bay door, I believe HINTON is ventilating the excess heat and powder from the confines

of the garage. A ZP33 machine is equipped with a powder suction unit to take in the residual powder during operation, so that blockage by residual powder can be eliminated. However, without proper maintenance this unit can become inoperable, resulting in powder accumulating in the workspace, as investigators have observed at HINTON's garage. HINTON appears to mitigate the accumulation of excess powder by simply blowing the powder out and away from the garage.

81.    This belief that HINTON is utilizing TARGET LOCATION 1 as a pill press operation and struggling with excess powder was later supported when investigators obtained a text message conversation that took place on March 10, 2024, between HINTON and an individual who investigators believe to be HINTON's daughter, herein referred to as "H.H." In the messages, HINTON discussed someone at TARGET LOCATION 1 getting a rash due to the powder. Based on my training and experience I know that the presences of illicit narcotics in powder form can become airborne and cause health issues to include rashes. The messages read, in relevant part:

| HINTON | 10:42 PM | Wyd beautiful |
|--------|----------|---------------|
| H.H | 10:47 PM | Just getting off wyd |
| HINTON | 10:47 PM | Rearranging my lab |
| HINTON | 10:48 PM | He broke out in a rash |
| H.H. | 10:49 PM | Ohhhhhhhh |
| H.H. | 10:49 PM | LMAOOOOO |
| HINTON | 10:51 PM | Powder is my ingredients |

82.    A similar conversation took place on March 12, 2024, between HINTON and an individual referred to herein as "J.D." who was identified as a potential customer and criminal associate of HINTON. HINTON and J.D. spoke of the recent improvements that were made to the "lab," which agents believe is a reference to TARGET LOCATION 1:

HINTON        (8:14 PM)        come by the lab anytime you want bro

HINTON     (8:15 PM)     I rearranged everything and have more ventilation
And purification

83.    I believe that HINTON's efforts to purify the air of contaminants and to increase ventilation inside his laboratory is strongly indicative of an active and robust pill pressing location.

### iii.    HINTON Uses Target Location 1 as an Additional Stash Location

84.    In addition to maintaining his "lab" and pill pressing operations at TARGET LOCATION 1, HINTON has also been observed transporting suspected narcotics or narcotics proceeds between TARGET LOCATION 1 and his residence at 55 Dewitt Street, TARGET LOCATION 2. For example, as set forth below, on May 24, 2024, HINTON was observed leaving TARGET LOCATION 1 and then meeting HARRIS outside of TARGET LOCATION 2 for a suspected hand-to-hand drug transaction, after which HINTON was observed entering directly into TARGET LOCATION 2 carrying a small package. Investigators believe that the package contained either an additional quantity of narcotics or proceeds from the transaction with HARRIS, as discussed in greater detail below, *see* ¶¶ 117-121.

85.    Similarly, on August 7, 2024, pole camera footage captured HINTON arriving at TARGET LOCATION 1 in the early morning hour and remained at TARGET LOCATION 1 until approximately 6:30 AM. In the morning, HINTON was observed walking out of TARGET LOCATION 1 carrying a large brown bag that appeared weighted and full. HINTON entered his vehicle with the brown bag and departed TARGET LOCATION 1. Approximately 10 minutes later HINTON arrived at TARGET LOCATION 2. Investigators observed HINTON exit his vehicle with the brown bag that still appeared weighted and full in addition to a white plastic bag and enter inside TARGET LOCATION 2 with both bags.

86.     HINTON remained inside TARGET LOCATION 2 until approximately 1:33 PM, when Investigators observed HINTON exit the front door of his residence carrying what appeared to be two (2) USPS small boxes consistent with prior Dark Web narcotic parcels that have been mailed by HINTON and seized by Law Enforcement. HINTON was observed leaving TARGET LOCATION 2 in his vehicle with the USPS parcels. At approximately 3:15 PM, Investigators observed HINTON arrive at TARGET LOCATION 1. HINTON exited his vehicle holding the two (2) USPS small boxes. HINTON briefly conversed with a white female operating a Black BMW X3 and then entered inside the shop with the USPS parcels.

87.     Based on my training and experience I know that often times drug traffickers will transport drugs from stash/ and pill manufacturing locations to other associated locations for redistribution. In this case, I believe that HINTON brought a quantity of drug from TARGET LOCATION 1 to TARGET LOCATION 2 and prepared at least two (2) USPS parcels that contained narcotics to be shipped to a dark web customers. Based on the facts set forth in this affidavit, HINTON has habitually used this type of small flat rate USPS parcels with prepaid cryptocurrency postage to mail pressed pills and other narcotics throughout the United States. Furthermore, I believe that HINTON brought the USPS parcels from TARGET LOCATION 2 back to TARGET LOCATION 1 so that his co-conspirator, STEPHENS could mail them out with additional parcels on that same date, August 7, 2024, as set forth below.

**D.     HINTON and HARRIS Sourcing Controlled Substances for the DTO**

88.     TDS investigators also collected evidence regarding HINTON's sources of supply. Investigators determined that HINTON is sourced through FedEx and USPS mailings sent from mainland China. Based on the evidence set forth below, investigators believe that HINTON arranges these parcels to be delivered to DTO members at their residencies to then be hand delivered, by the DTO member, to HINTON in person at TARGET LOCATION 1 or at his

residence, 55 Dewitt Street ("TARGET LOCATION 2"). This tactic is an indication of HINTON's knowledge of law enforcement investigative techniques, specifically those of the USPIS, involving the detection and seizure of parcels from the U.S. mail stream. In order to mitigate the risk of disruption to their drug trafficking business, traffickers will utilize other third parties to accept delivery of parcels containing drugs and/or contraband. Heshima HARRIS and others were identified as trusted DTO members who have received parcels containing controlled substances, as well as other instrumentalities of drug manufacturing, on HINTON's behalf.

### i. *HSI Seizure of Parcel Containing Xylazine Addressed to HARRIS*

89.    On July 4, 2023, CBP seized a parcel at the FedEx hub in Memphis, Tennessee. The FedEx parcel with tracking label 780323337619 was addressed to Heshima HARRIS at his residence of 539 East Street New Haven, CT, 06511. The label also included a phone number, 475-301-3536, which investigators have determined actually belongs to HINTON.[2]  The parcel was sent from "Zhangyinbo XIAN Sheerherb Biological Technolo Cao Tan 6 Road Huijin Chuang Ye Yua Xian SH, China 710033."  A physical examination of the parcel led CBP to believe the parcel contained controlled substances weighing approximately one kilogram. CBP agents contacted members of the HSI New Haven Office and the parcel was transferred to their custody.

90.    HSI agents then contacted DEA TDS and USPIS members after an investigative overlap was discovered with links to HARRIS. On July 10, 2023, HSI New Haven received the parcel and transferred it to their laboratory for testing. The testing results showed the substance

---

[2] Investigators have conducted extensive toll analysis on phones related to HINTON in this case coupled with physical and electronic surveillance on HINTON and his criminal associates. During the course of this investigation the 475-301-3536 phone has communicated with criminal associates who have arrived at either TARGET LOCATION 1 or TARGET LOCATION 2 shortly thereafter. Based on my training and experience I know that drug dealers utilize multiple phones in order to thwart law enforcement detection.

within the parcel to be approximately one kilogram of Xylazine.[3] Investigators believe this parcel was to be delivered to HINTON. This belief is supported by surveillance of other parcels that were successfully delivered to HARRIS that were later delivered to HINTON. HINTON arranges these parcels to be delivered to DTO members at their residencies to then be hand delivered by the DTO member to HINTON in person. This tactic of using "drop addresses" is an indication of HINTON's knowledge of law enforcement investigative techniques, specifically those of the USPIS, involving the detection and seizure of parcels from the mail stream. In order to mitigate the risk of disruption to their drug trafficking business, traffickers will utilize other third parties to accept delivery of parcels containing drugs and/or contraband. HINTON's pattern of using drop addresses has been consistently demonstrated throughout this investigation.

91.      Additionally, investigators know that Xylazine is an ingredient that HINTON uses in his counterfeit tablets Oxycodone and Percocet tablets. Investigators seized tablets containing Xylazine that were linked to HINTON on August 8, 2023 during a trash pull and on August 24, 2023 from a seized outgoing USPS parcel.

### ii.     HSI Seizure of Parcel Containing Dimethylpentylone Addressed to HARRIS

92.      On August 15, 2023, CBP placed a suspicious parcel on hold at JFK International Airport. This parcel arrived from China via flight KAL 85 and was manifested as "STICK TRIPOD." Physical examination of the package revealed one vacuumed sealed aluminum package. Inside the aluminum package was a second foil package which contained a white powdery substance. The powdery substance was tested using Gemini Thermo-Scientific Device, which resulted positive for DIMETHYLPENTYLONE HCL, a Schedule I controlled substance.

---

[3] As set forth above, although Xylazine, aka "Tranq," is not a controlled substance, it is a veterinary sedative not approved for human consumption that is commonly used as a cutting agent by drug traffickers to enhance the effects of the controlled substances with which it is mixed.

CBP then seized the shipment and notified HSI agents. A total of approximately 112g was seized and eventually transferred to HSI New Haven. The powder was laboratory tested by HSI and found to contain Dimethylpentylone. The parcel was addressed to Heshima HARRIS at his residence. The shipper was identified as WUXI YOUFUDA TRADE CO., LTD, NO. 227 FUMIN ROAD, ZHEJIANG, WUXI, CHINA.

93.    Investigators believe this parcel was to be delivered to HINTON. This belief is supported by surveillance of other parcels that were successfully delivered to HARRIS that were later delivered to HINTON.

### iii.    HSI Seizure of Parcel Containing Protonitazene Addressed to HARRIS

94.    On August 20, 2023, CBP Officers in Chicago inspected a shipment that was labeled as "earring" and was found to contain a bag of an unknown white powder.

95.    The bag was seized by CBP Officers on August 20, 2023. CBP Officers advised that the package appeared to have two labels. The first label reflected that the package was sent from "Thomas Rodemann New Tech Road 247, Shanghai, China (Mainland)" and was addressed to "Cheryle Tyson 539 East St, New Haven, CT 06511, United States of America."

96.    Investigators know that Cheryle Tyson, another associate of HINTON who has been observed receiving packages and delivering them to HINTON, does not reside at 539 East Street and that the address is the residence of HARRIS. I believe based on the shipping practices of HINTON as well as my training and experience, that the presence of Tyson's name and HARRIS's address on the parcel is an indication that both HARRIS and Tyson are aware of the contents of the parcels being shipped and then hand delivered to HINTON.[4]

---

[4] A package from China addressed to Cheryle Tyson at her own residence, 67 Ellsworth Street, was located during the trash pull at TARGET LOCATION 1 on August 8, 2023, as discussed above. Investigators have observed Tyson receiving packages at that location and delivering them to HINTON as part of the investigation.

97.    A photograph taken by CBP of the package revealed a second shipping label showing domestic return address of "Jane 371 Little Falls Rd STE 4, Cedar Grove, NJ" and addressed to "Cheryle Tyson, Heshima HARRIS, 539, East St, New Haven, CT, 06511-3902." CBP advised that this parcel was likely initially transported in bulk cargo from China to the U.S (reflected on the first label) and the parcel would most likely have been sorted at the domestic shipping address (reflected on the second label), before being sent to HARRIS to his residence.

98.    On September 22, 2023, HSI New Haven received and took custody of the package. A representative sample of the unknown white powder was sent to the CBP lab for analysis and returned a positive test result for Protonitazene. Investigators know that Protonitazene is a synthetic opioid exhibiting potency approximately three times that of fentanyl. Protonitazene, a Schedule I controlled substance, is known to be an ingredient in the manufacture of counterfeit tablets.

99.    Investigators believe this parcel was to be delivered to HINTON. This belief is supported by surveillance of other parcels that were successfully delivered to HARRIS that were later delivered to HINTON.

100.    Additionally, investigators know that Protonitazene is an ingredient that HINTON uses in his counterfeit tablets Oxycodone and Percocet tablets. Investigators seized tablets containing Protonitazene that were linked to HINTON on August 8, 2023 during a trash pull as well as from seized outgoing parcels on August 14, 2023, August 23, 2023 and September 15, 2023.

### iv.    *Seizure of Parcels Containing Pill Punch and Die Molds Addressed to HARRIS*

101.    On July 27, 2023, Customs and Border Patrol ("CBP") seized four parcels in Memphis, TN.  The parcels were sent from 1133 Yuyao Yingtu Plastic Co LTD, DD129 Lot 2177

2378RP, Kowloon, TX 180, Hong Kong SAR to Heshima HARRIS, 539 East St, New Haven, CT, 06511 The parcels were found to contain pill press die mold sets. CBP transferred the parcels to Homeland Security Investigations ("HSI") New Haven.

102.    On November 15, 2023, HSI New Haven Special Agents examined the set of four parcels that were seized by CBP at the FedEx hub in Memphis, TN on July 27, 2023 and observed the following:

- The package seized as LI 001 contained (33) pill press die sets with the "B707" markings and four square markings which correspond to Alprazolam 2mg.

- The package seized as LI 002 contained (33) pill press die sets with the "M 30" markings which correspond to Oxycodone Hydrochloride 30mg.

- The package seized as LI 003 contained (33) pill press die sets with the "b 974 30" markings which correspond to Amphetamine and Dextroamphetamine 30mg.

- The package seized as LI 004 contained (33) pill press die sets with the "M 10" markings which correspond to Oxycodone Hydrochloride 10mg.

103.    Investigators know through training and experience that a ZP33 machine utilizes die sets that are unique to the ZP33 model. A "die" refers to a die mold, which is used with a pill press machine to cut and mark tablets into a particular size. "Punches" are a rod-shaped implement that often bear an imprint on one end and are used to imprint a particular marking or logo onto the sides of a tablet. These seized sets of die sets in particular, are molds of highly sought after controlled substances.

104.    The seized M/30 die mold has been directly linked to HINTON's pressing operations after investigators conducted a controlled purchase of 500 counterfeit Oxycodone tablets marked "M/30" on November 15, 2023 as well as the seized August 14, 2023 USPS parcel. Additionally, HINTON's vendor site also advertises counterfeit "X500 M30 Blues smokable oxy US to US."

105.    The B974/30 die mold, like the one seized above, has been directly linked to HINTON's pressing operations after investigators conducted a controlled purchase of 100 counterfeit Adderall tablets marked B974/30 on October 12, 2023. Additionally, HINTON's vendor site advertises a listing for "Quality pressed Adderall B974 US2US (Free shipping)."

106.    The "M/10" die mold, like the one seized above, has also been directly linked to HINTON's pressing operations after Arnaldo ECHEVARRIA was arrested in possession of approximately 1,000 counterfeit tablets marked "M/10" on July 31, 2024, as discussed in further detail below.

107.    Based on my training and experience, I believe that the fact that the seized die mold sets were addressed to HARRIS at his residence is further corroboration of the established pattern of HINTON's use of drop addresses in an attempt to insulate himself from law enforcement detection by using DTO members to procure controlled substances, and in this case, highly scrutinized items vital to the manufacture of tablets, utilizing a ZP33 tableting machine.

### v.    *HINTON Tracking Packages Being Delivered to HARRIS's Residence*

108.    During this investigation, records were sought from Frontier – Southern New England Telephone ("SNET") specific to TARGET LOCATION 1 for internet related activity. Investigators believed that HINTON had a WIFI account at 34 TARGET LOCATION 1 and was conducting dark web transactions from 34 Tyler Street Extension. SNET returned results from the government's request for records that indicated that HINTON had an SNET account in the name of "KLH Ventures LLC" at the account address of TARGET LOCATION 1 and a billing address of TARGET LOCATION 2.

109.    A check of Postal Business Records indicated that HINTON's SNET account at TARGET LOCATION 1 inquired the status of several USPS parcels associated with known drop addresses utilized by the HINTON DTO, including at least 4 different parcels with HARRIS's

residence believed to contain either controlled substances or pill press parts between July and August 2023.

110.    The tracking of these packages by HINTON provides investigators with further evidence that HARRIS was working closely with HINTON to acquire controlled substances and pressing equipment to further the operation of the DTO.

**E.    HARRIS ordering Pills from HINTON for Resale**

111.    In addition to receiving packages of substances and materials for the DTO, investigators have also learned that HARRIS redistributes to his own customer base. This belief is supported by text message content between HINTON and HARRIS, obtained by investigators through authorized court process on Verizon wireless. Physical surveillance on HARRIS also corroborated investigators' belief that HARRIS redistributes to his own customer base as he was observed conducting suspected hand-to-hand transactions for unknown quantities of unknown controlled substances at his residence.

112.    For example, on March 11, 2024, from approximately 4:43 PM to 4:57 PM, the HARRIS Telephone communicated with the HINTON Telephone via text message regarding a meeting for the distribution of controlled substances to take place at Walgreens Pharmacy in East Haven, CT:

| | | |
|---|---|---|
| HARRIS | (4:43 PM) | "100 Xanys 20 Addys" |
| HARRIS | (4:43 PM) | "I'll head that way now" |
| HINTON | (4:44 PM) | "Ok" |
| HARRIS | (4:56 PM) | "I'm at Walgreens" |
| HINTON | (4:57 PM) | "Ok" |

113.    Based on my training and experience I believe the text conversation between HINTON and HARRIS was used to coordinate a transaction for controlled substances. I know that

the term "Xanys" is a commonly used slang term for the drug Xanax. I also know that the term "Addys" is another commonly used slang term for the drug Adderall. Based on my knowledge of this case, I know that HINTON manufactures and distributes counterfeit Xanax and Adderall tablets. These drugs are highly sought after among pill seeking individuals. Based on my training and experience I believe the quantities discussed, 100 Xanax and 20 Adderall, are distribution quantities and not personal use. HINTON indicated that he understands what HARRIS is requesting from him when he responded "OK." HARRIS set the location of the meeting at "Walgreens." I know, based on my knowledge of this case that the Walgreens located at 157 Main Street, East Haven is approximately one minute from HINTON's pressing location. HINTON responded to HARRIS, "Ok," agreeing to meet.

114.    Based on my knowledge of this case I know that the Walgreens is a location used by HINTON to supply his redistributors throughout this investigation. For example, on May 7, 2024, HINTON was observed conducting a hand-to-hand transaction for an unknown quantity of an unknown controlled substance in the parking lot with another individual. I know based on my training and experience that drug traffickers will meet their customers in neutral places such as a parking lots, in order to protect their most sensitive locations (residence, stash locations) by creating a degree of separation between those locations and their drug activity.

115.    Investigators reviewed the previously recorded electronic surveillance at TARGET LOCATION 1. At approximately 5:07 PM, investigators observed HINTON exit TARGET LOCATION 1 and walk towards his vehicle. Investigators did not see HINTON carrying anything in his hands as he entered the driver seat. Based on my training and experience I know that street level quantities of counterfeit pills, such as those discussed here, could be easily secreted on

HINTON's person. HINTON then departed TARGET LOCATION 1. At approximately 5:20 PM, investigators observed HINTON as he returned to TARGET LOCATION 1.

116.    I believe, through training and experience that a brief meeting between subjects is an indicator of narcotic trafficking activity. Combined with my knowledge of this case, the text messages above, as well as the subjects and locations involved, I believe HINTON met HARRIS at Walgreens to conduct a transaction for 100 fake Xanax tablets and 20 fake Adderall tablets and the substances sold to HARRIS were retrieved from TARGET LOCATION 1.

### i.    May 24, 2024 Meeting between HINTON and HARRIS

117.    Investigators reviewed electronic surveillance of a meeting between HINTON and HARRIS at TARGET LOCATION 2 via pole camera that took place on May 24, 2024.

118.    At approximately 5:20 PM, investigators observed HINTON arrive at TARGET LOCATION 1 and park in front of the first garage bay. Investigators observed HINTON enter TARGET LOCATION 1 through the door and remain inside for approximately 5 minutes. At approximately 5:25 PM, HINTON exited TARGET LOCATION 1 and departed the area in his vehicle. Pen register data indicated that HINTON's cellular telephone and HARRIS's cellular telephone exchanged several text messages earlier in the day and that at approximately 5:30 PM, HINTON received a 32 second incoming call from HARRIS.

119.    At approximately 5:42 PM, investigators observed HINTON arrive at TARGET LOCATION 2 and park on the street in front of his residence. HINTON remained inside his vehicle. At approximately 5:48 PM, investigators observed a white Mercedes-Benz sedan arrive and park behind TARGET VEHICLE 1. Pen register data indicated that at approximately 5:49 PM, HINTON received a 15 second incoming call from HARRIS. Seconds later, investigators observed HARRIS exit the white Mercedes-Benz wearing a black t-shirt and a white bucket style hat. Investigators observed HARRIS walk to the driver side window of TARGET VEHICLE 1 and

reach inside with both arms. A few moments later, investigators observed HARRIS stand up and step back on the sidewalk. At this time, investigators observed an item in HARRIS's right hand that appeared to be a white bag. Investigators believed the bag to be a slightly smaller in circumference than a baseball. Investigators observed HARRIS appear to inspect the bag while walking back toward his vehicle. Based on my training and experience, as well as my knowledge of HINTON being a manufacturer of pills and HARRIS to be a customer and redistributor of pills, I believe the baseball sized item to be a bag of pressed pills. I know that when small pills are packaged together in a plastic bag, they clump together to form a shape similar to that of a baseball. Investigators observed HARRIS enter the driver seat of the vehicle leaving the door open and re-emerge moments later. Investigators observed HARRIS standing in the door jamb of the vehicle and appear to be reaching into his pockets. Moments later, HARRIS re-entered the vehicle and departed the area.

120.    At approximately 5:52 PM, investigators observed HINTON exit TARGET VEHICLE 1 carrying a small white item, possibly a bag, and enter TARGET LOCATION 2 through the front door. At approximately 5:54 PM, investigators observed HINTON exit TARGET LOCATION 2 empty handed and depart the area in TARGET VEHICLE 1.

121.    Based on my training and experience I believe that HARRIS met HINTON at TARGET LOCATION 2 to conduct a transaction for a quantity of a controlled substance, possibly counterfeit pills.  I believe that HINTON retrieved the controlled substances from TARGET LOCATION 1 because HINTON drove to the meeting with HARRIS, directly from TARGET LOCATION 1. Further, I believe that after the transaction with HARRIS, HINTON, carrying the drug proceeds in the white bag, secured them inside TARGET LOCATION 2. This belief is

supported by the observation of HINTON subsequently departing TARGET LOCATION 2 without the white bag in his hands.

### ii.    *HARRIS Conducts Suspected Hand-to-Hand Drug Transactions*

122.    Most recently, on August 23, 2024 surveillance was established at HARRIS's residence. Surveillance observed HARRIS standing at the passenger side window of a black sedan with Massachusetts plates reaching into the passenger side window of the vehicle. A few seconds later HARRIS was observed walking away from the sedan and crossing the street back towards TARGET LOCATION 3. At this time, surveillance also observed a blue Honda Accord parked on the same side of the street as TARGET LOCATION 3 but a few houses up in the direction of State St. The vehicle seemed to be running because it had the daytime running lights on and was occupied by two unknown white males wearing flat brimmed hats. HARRIS walked away from the black sedan with MA plates, and then walked to the blue Honda accord. Surveillance observed HARRIS approached the passenger side of the vehicle and made contact with the occupants through the open passenger side window. HARRIS leaned into the window and appeared to be conducting a hand-to-hand drug transaction. HARRIS remained at the passenger window for approximately one minute. Surveillance then observed HARRIS walk back towards his building while the blue Honda Accord pulled out onto East St. and traveled toward the highway.

123.    Surveillance was able to identify the CT registration of the vehicle. The license plate was electronically queried utilizing the Connecticut motor vehicle database and revealed the vehicle was registered to an individual that SA Lang recognized as a patient of a doctor who was previously investigated and arrested by the DEA NHDO TDS for illegally prescribing hundreds of thousands of Oxycodone tablets. The individual named in the vehicle's registration was a patient of that doctor from 2017-2020 and received monthly prescriptions of Oxycodone and OxyContin tablets. Based on this information, I believe the individual meeting with HARRIS was likely a

customer looking for counterfeit pills, similar to the pills being manufactured and distributed by the Hinton DTO.

**F.      PAYTON Meeting with HINTON and Distributing Controlled Substances**

124.      Emanuel PAYTON is believed to be another trusted member of the HINTON DTO. This belief is supported by surveillance and text message content obtained by agents from Verizon Wireless. Toll records indicate that PAYTON is a top caller on the HINTON Telephone and that HINTON and PAYTON communicate extensively throughout the day and night. The text message content received from Verizon Wireless indicate that PAYTON knows HINTON is operating a "lab" and that HINTON has various drugs for sale. PAYTON demonstrated to agents that over the course of this investigation that he distributes controlled substances to his customer base and the controlled substances are sourced from HINTON at TARGET LOCATION 1. Investigators also know that during PAYTON's frequent visits he will, at times, remain at TARGET LOCATION 1 for hours. Based on the cumulative knowledge of TARGET LOCATION 1, garnered from multiple investigative tools and my training and experience, I believe PAYTON assists HINTON with the dark web distribution of the DTO. This belief is supported by surveillance of PAYTON, described more fully below, at TARGET LOCATION 1, carrying a small laptop computer and remain inside for approximately 5 hours. PAYTON has also been surveilled back to his residence, carrying the laptop computer with him. Additionally, the same laptop was with PAYTON during a West Haven motor vehicle stop, when PAYTON was arrested for possession of controlled substances following a meeting with HINTON.

*i.      September 20, 2023 Meeting between PAYTON and HINTON*

125.      Pole camera footage captured on September 20, 2023, at approximately 5:49 PM, showed a vehicle enter the driveway at TARGET LOCATION 1 and park at the garage. At approximately 5:53 PM, investigators observed HINTON arrive in a black Nissan Sentra and park

in front of the first garage bay. As HINTON parked, a black male later identified as PAYTON, exited his vehicle and greeted HINTON. Investigators observed HINTON carrying the blue re-usable Walmart grocery bag. HINTON and PAYTON entered TARGET LOCATION 1.

126.    At approximately 6:14 PM, HINTON and PAYTON exited TARGET LOCATION 1 and remained outside conversing. Investigators observed PAYTON to have a large bulge in his front right pant pocket area that was not present during his arrival. Based on training and experience, investigators believe the round mass in PAYTON's pant pocket appeared to be similar in size and shape to one created by a large quantity of tablets. At approximately 6:16 PM, HINTON and PAYTON gave each other a hug, and PAYTON walked back to his vehicle and departed the area. HINTON walked back inside TARGET LOCATION 1. Based on training and experience, I believe PAYTON met HINTON briefly inside TARGET LOCATION 1 to obtain an unknown quantity of an unknown controlled substance. In addition, I believe the telephone exchanges between HINTON and PAYTON were made to coordinate the meeting. This belief is supported by my training and experience that brief phone calls and/or text messages are indicators of coordination between a customer and dealer prior to meetings for street level drug sales.

### ii.    October 19, 2023 Meeting Between HINTON and PAYTON

127.    On October 19, 2023 investigators conducted electronic surveillance at TARGET LOCATION 1 via pole camera. At approximately 4:04 PM, investigators observed HINTON arrive at TARGET LOCATION 1 and park in front of the first garage bay. Investigators observed HINTON retrieve items from the passenger seat of the vehicle and enter the shop.

128.    At approximately 4:53 PM, investigators observed PAYTON wearing black joggers, black sweatshirt, and white baseball hat walk up the driveway on his cellphone and enter TARGET LOCATION 1. At approximately 4:57 PM, investigators observed PAYTON exit

TARGET LOCATION 1 carrying a white bag and proceed to walk down the driveway out of view of the camera.

129.    Based on training and experience, I believe PAYTON met HINTON briefly inside TARGET LOCATION 1 to obtain an unknown quantity of an unknown controlled substance.

### iii.    March 14, 2024 Communications Between HINTON and PAYTON

130.    On March 14, 2024 at approximately 7:00 PM investigators conducted live electronic surveillance of TARGET LOCATION 1 and observed that HINTON was there. HINTON and PAYTON communicated via text message to arrange a meeting to exchange controlled substances.    Specifically, at approximately 7:05 PM, the PAYTON Telephone communicated with the HINTON Telephone, and engaged in the following text conversation regarding a meeting at TARGET LOCATION 1:

(7:05 PM) HINTON: Wya

(7:23 PM) PAYTON: Crib

(7:25 PM) HINTON: I'm at the lab

(7:25 PM) PAYTON: On my way

(7:37 PM) HINTON: Ok

(7:37 PM) HINTON: I have purple mdma for sale and ketamine sugar and needles

131.    Based on my training and experience I believe that when HINTON stated he was "at the lab" he meant TARGET LOCATION 1 based on the live electronic surveillance. HINTON's description of TARGET LOCATION 1 as "the lab" also corroborated investigators belief that HINTON utilizes the location for the processing of controlled substances. After the location of the meeting was established, PAYTON indicated he was on his way. HINTON responded with a list of substances he had available for sale, "purple mdma for sale and ketamine sugar and needles."

132.    Investigators watched via pole camera as PAYTON arrived at TARGET LOCATION 1 and entered into the side door of the garage where HINTON was waiting for him. Approximately 20 minutes later, the side door opened, and HINTON and PAYTON exited. Investigators observed a small object in PAYTON's left hand. PAYTON walked straight to the Chevrolet Malibu and entered into the driver seat, backed out of the driveway and left the area. HINTON waited outside of the door for a brief moment while PAYTON entered into the vehicle, then went back into TARGET LOCATION 1.

133.    Based on the text message exchanges between HINTON and PAYTON, as well as my training and experience, I believe that HINTON and PAYTON arranged a meeting at TARGET LOCATION 1 to coordinate the sale of controlled substances.  Specifically, I believe PAYTON met HINTON inside TARGET LOCATION 1 to obtain a quantity of controlled substances.

### iv.    April 28, 2024 Meeting Between HINTON and PAYTON

134.    Based on a review of previously recorded electronic surveillance at TARGET LOCATION 1, investigators determined that on April 28, 2024, at approximately 4:28 PM, HINTON arrived at TARGET LOCATION 1 and parked in front of the first garage bay. At approximately 6:02 PM, PAYTON arrived at TARGET LOCATION 1 carrying what appeared to be a black laptop. PAYTON walked into the shop through the open garage door. For the next several hours the garage door was opened and closed several times. Based on my training and experience I believe the garage door was opened and closed several times to increase ventilation during times when the pill press was active.

135.    At approximately 11:12 PM, HINTON and PAYTON exited TARGET LOCATION 1 through the door simultaneously. Investigators observed PAYTON carrying what appeared to be a black laptop as he walked towards his vehicle. The two communicated briefly between their cars and then simultaneously departed the area of TARGET LOCATION 1.

136.    PAYTON's arrival at the shop was preceded by several telephone exchanges with the HINTON that included telephone calls and a text message that occurred at 4:19 PM, 4:27 PM and 5:15 PM. Additionally, investigators believe that because PAYTON carried the black laptop into TARGET LOCATION 1, he may be assisting HINTON with the dark web activities of the DTO. This belief is supported by a number of factors. First, investigators know that much of the HINTON DTO distribution is facilitated through the dark web, based on dark web controlled purchases conducted by DEA and USPIS agents, as well as the seizure of parcels containing controlled substances and surveillance of mailings by HINTON. Based on my training and experience I know that Dark Web vendors spend a significant amount of time managing their vendor pages. These activities can include accepting and processing orders, packaging orders, updating listings, and communicating with customers. Based on the volume of parcels and capabilities of HINTON's pill pressing operation I believe that PAYTON is assisting HINTON with these operations. Secondly, investigators believe that PAYTON is a trusted DTO member and subordinate to HINTON. This trust is demonstrated by PAYTON's consistent presence at TARGET LOCATION 1. Investigators know that a stash/ manufacturing location would be a closely guarded secret among drug traffickers. HINTON has shown that he only trusts a small number of his customers and DTO members with this information. Thirdly, based on my training and experience, an iPad/computer is not an item typically brought to a meeting to buy controlled substances. Lastly, PAYTON remained inside TARGET LOCATION 1 for over five hours with HINTON. Based on my training and experience, a typical drug transaction is quick. The lengthy stay indicated PAYTON may have had a secondary purpose for meeting with HINTON. For the given reasons, investigators believe PAYTON's secondary purpose of meeting at TARGET

LOCATION 1 with HINTON may have been to assist HINTON with his dark web drug trafficking sales.

### v.    May 10, 2024 Surveillance of HINTON and Arrest of PAYTON

137.    On May 10, 2024, TDS members conducted surveillance on HINTON as he exited TARGET LOCATION 2 and proceeded to TARGET LOCATION 1. Within minutes of arriving at TARGET LOCATION 1, HINTON exited TARGET LOCATION 1, got back into his vehicle, and left the area.

138.    Moving surveillance was established on HINTON. At approximately 1:44 PM, HINTON arrived at Cody's Diner located at 95 Water St. in New Haven and parked in the parking lot. Investigators observed PAYTON's vehicle parked in the lot as well. A third vehicle, a black Honda Civic was also in the parking lot. Case agents were unable to observe the parking lot meeting in full due to the area being difficult to establish surveillance. This in part was due to the fact that the parking lot was empty at this time. Investigators observed a short black male, later identified as PAYTON, standing at the passenger side of HINTON's vehicle. Within minutes of HINTON arriving, all three vehicles left the parking lot.

139.    Based on my training and experience I know that brief meetings between individuals, such as the one described above, are an indicator of street level drug trafficking. I also know that drug traffickers will often meet their customers in secluded areas, such as parking lots to conduct their transactions, in part, to thwart potential surveillance efforts of law enforcement.

140.    PAYTON drove onto I-95 South to exit 40 in Milford and exited. At approximately 2:00 PM PAYTON arrived at a residence located at 200 Roses Mill Rd. in Milford. Approximately eight minutes later, PAYTON left the residence. Through my training and experience, short stays at a residence is consistent with hand-to-hand narcotic transactions. Combining my knowledge regarding PAYTON's prior narcotic convictions with my knowledge of this case regarding

PAYTON's current drug trafficking, I believe there was a hand-to-hand drug transaction that occurred at that residence. Later, this belief was supported by information from the Milford Police Department regarding 200 Roses Mill Rd. The information provided originated from official Police reports and tips regarding 200 Roses Mill Road regarding possible drug activity. Milford Police Department received a tip as recent as March 2024 regarding possible drug activity, and another on February 2024 regarding drug activity and strange vehicle traffic. Surveillance followed him back onto I-95N and towards West Haven. Investigators coordinated with the West Haven Police department to assist with a motor vehicle stop on PAYTON once he entered into West Haven. Officers responded to the area and the motor vehicle stop was conducted at Malloy Road /Boston Post Rd in West Haven. It was then discovered that there was a front seat passenger in PAYTON's vehicle, who was positively identified.

141.    A search of PAYTON's vehicle was completed.  Located in plain view at the driver door interior grab handle compartment was one (1) small clear zip-lock style baggy that contained a white powdery substance, suspected to be fentanyl. Laboratory analysis later confirmed the powder residue contained cocaine, fentanyl and xylazine. Located in plain view in the rear passenger door interior grab handle compartment was one (1) round pink pill with 10 imprinted on one side and possibly an M with a square around it imprinted on the other, suspected to be an Oxycodone 10mg tablet. Laboratory analysis later confirmed the tablet contained Acetaminophen and xylazine. It should be noted the pill imprints were not distinct and were difficult to read. Judging by the condition of the tablet, and my training and experience, I believe the tablet was not prescription grade. Based on my knowledge of this case I also believe that the tablet was similar to those tablets that were pressed by HINTON utilizing a tableting machine.

142.    Also located in the vehicle but not seized were three (3) cell phones: one (1) iPhone with a white case, one (1) iPhone with a black diamond style case, and a black TCL. Inside of PAYTON's passenger's purse was approximately $405.00 of U.S. currency in denominations of 20's,10's, 5's and 1's. The money was folded and laying freely inside of her purse. Based on my training and experience the denominations of currency located within the purse were consistent with typical proceeds of street level quantities of narcotics. Investigators also observed many dollar bills strewn about the interior of the vehicle. I believe that the scattered loose currency in the vehicle is an indication of someone who hurriedly transferred cash from one location to another. Based on the above observations as well as my training and experience I believe that PAYTON hastily removed the cash proceeds, derived from the previously mentioned suspected drug transaction, from his person into his associate's purse, as West Haven Police were executing the motor vehicle stop.

143.    Officers also located a box of sandwich style baggies inside the vehicle. I know based on my training and experience that plastic sandwich bags are commonly used by drug traffickers to package their narcotics into small, easily concealable, and transportable street quantities. Investigators did not locate a scale in the vehicle. This is consistent with pill trafficking as scales would not necessarily be needed as pills generally have a consistent weight are easily counted as dosage units and bagged.

144.    Lastly, Officers also located an HP laptop computer Serial Number 5CG2493LB6, located in the "rear deck" area of PAYTON's vehicle. The "rear deck" area is described as the flat area extending from the top of the back seat to the rear window. Based on size and color, investigators believe this laptop is the same item that PAYTON was seen carrying when he visited HINTON on April 28, 2024  at TARGET LOCATION 1, discussed below.

145.    Based on my training and experience, I believe the seized narcotics were provided to PAYTON by HINTON.  This belief is supported by the fact that the exhibits contained Xylazine and cocaine, both of which have been seized by investigators from parcels associated with the Hinton DTO.  In addition, not only does HINTON's vendor page include listings to purchase, "99.9% Pure Cocaine," but also the pill seized from PAYTON appeared to be similar in quality and general appearance as the other counterfeit pills seized in this case that investigators believe were pressed at HINTON's lab at TARGET LOCATION 1.

### vi.    PAYTON Engages in Suspected Hand to Hand Transaction

146.    On February 21, 2024 surveillance observed PAYTON exit his residence in New Haven., get into his vehicle, and drive out of the lot.  Moving surveillance was established and followed PAYTON to nearby Dickerman Street. Surveillance observed an older model blue Honda CRV following PAYTON in tandem when he turned onto Dickerman Street.  A Connecticut department of motor vehicle electronic query search on the plate revealed a valid registration on the Honda CRV to a person identified herein as J.K.

147.    The vehicles traveled halfway up Dickerman Street and parked on the right side of the road. Surveillance observed a white male, later confirmed to be J.K. from his DMV photograph, exit the driver's seat of the CRV and walked to the passenger side of PAYTON's vehicle.

148.    Seconds later, J.K. got back into the driver seat of his vehicle and both J.K. and HINTON departed the area. Based on my training and experience this brief meet is indicative to a hand-to-hand narcotic transaction. Further, an electronic Connecticut state police records check revealed that J.K. has been previously arrested and convicted on several occasions for possession of narcotics.

## G.    ECHEVARRIA Sources Controlled Substances from HINTON

149.    On July 31, 2024, members of the DEA New Haven District Office (NHDO) Tactical Diversion Squad (TDS) conducted surveillance of HINTON as he departed the area of his residence, TARGET LOCATION 2 operating TARGET VEHICLE 1.   HINTON proceeded to TARGET LOCATION 1.   Thereafter, HINTON was observed exiting TARGET LOCATION 1 from its side door and re-enter TARGET VEHICLE 1, which agents had determined was a rental vehicle rented from EAN Holdings to HINTON using both his name and the Hinton Telephone.[5]

150.    Surveillance followed HINTON to the parking lot of Ocean State Job Lot located at 1231 E. Main St. Meriden, CT. HINTON parked his vehicle in a parking space in front of the store and remained inside the vehicle. Surveillance then observed a gray colored Acura sedan arrive and park in the area of HINTON's vehicle. A department of motor vehicle electronic query revealed the vehicle to be registered to Arnaldo ECHEVARRIA, of 450 Hill St. Apt. 10, Waterbury, CT.

151.    Surveillance observed the Acura sedan park in close proximity to HINTON's vehicle. Surveillance observed ECHEVARRIA, wearing a white t-shirt, jeans, timberland boots, a white Celtics hat with a green brim, and a large gold colored watch exit the Acura and walk towards the passenger side of HINTON's TARGET VEHICLE 1. Surveillance observed ECHEVARRIA enter the passenger seat of TARGET VEHICLE 1, then close the door of the vehicle.

---

[5] HINTON has been observed operating numerous vehicles, including a rental vehicle, during the course of the investigation.  As set forth herein, those trips have included to U.S. Post Offices to drop off suspected dark web drug customer packages, *see* ¶¶ 35-38, to transport items between his suspected stash location at TARGET LOCATION 1 and his pressing location and "lab" at TARGET LOCATION 2, *see, e.g.*, ¶¶ 33, 84, to meet customers for suspected hand-to-hand transactions, *see* ¶¶ 119-120, and maintaining suspected dark web packages in his trunk, *see* ¶ 28, and he has also been surveilled while speaking on cell phones, and visiting a bank.  As a result of those observations, investigators have probable cause to believe that evidence of the Target Offenses can be found in TARGET VEHICLE 1, including but not limited to receipts obtained from those locations, as well as possible controlled substances, packaging materials and reusable baggies and totes, and cell phones.

152.    Surveillance then observed ECHEVARRIA exit HINTON's vehicle and remain at the open passenger door of TARGET VEHICLE 1. Surveillance observed ECHEVARRIA to be disturbed, as ECHEVARRIA waving his hands in a seemingly agitated manner. Surveillance then observed ECHEVARRIA return to his Acura sedan. Surveillance observed both vehicles depart the Ocean State Job Lot parking lot at the same time and noted that ECHEVARRIA followed HINTON.

153.    Surveillance observed HINTON and ECHEVARRIA travel in tandem, and that HINTON appeared to be leading ECHEVARRIA towards the press location. Surveillance followed HINTON and ECHEVARRIA onto Hemingway Ave, where ECHEVARRIA turned into the Stop and Shop parking lot located at 370 Hemingway Ave. East Haven, CT. Surveillance observed HINTON continue on Hemingway Ave. Surveillance then observed ECHEVARRIA park in the parking lot of the Stop and Shop parking lot and remain inside of his vehicle. Surveillance monitored the live pole camera and observed HINTON arrive at TARGET LOCATION 1.

154.    Surveillance observed HINTON exit TARGET VEHICLE 1 and enter TARGET LOCATION 1 from the side door. After several minutes, surveillance observed HINTON exit TARGET LOCATION 1 and return to the driver seat of TARGET VEHICLE 1. Surveillance then observed HINTON depart the area of the shop and travel to the Stop and Shop parking lot. Surveillance observed HINTON drive to and park in close proximity to where ECHEVARRIA was parked. Surveillance observed HINTON park next to ECHEVARRIA's vehicle. Surveillance then observed ECHEVARRIA exit his vehicle, then approach and enter the passenger seat of TARGET VEHICLE 1. Shortly after, ECHEVARRIA exited TARGET VEHICLE 1 and entered back into his driver seat. HINTON and ECHEVARRIA departed the area in separate directions.

155.    Moving surveillance was maintained on ECHEVARRIA. Surveillance observed ECHEVARRIA exit the parking lot onto Main St. Surveillance observed that ECHEVARRIA was traveling slowly and making last second turns. Surveillance observed ECHEVARRIA ultimately travel to Waterbury, CT via Interstate 84. While conducting surveillance of ECHEVARRIA, members of the DEA NHDO coordinated a motor vehicle stop of ECHEVARRIA with the Waterbury Police Department.

156.    Members of the Waterbury Police Department conducted a traffic stop of ECHEVARRIA. Officers located in plain view a clear, knotted sandwich style plastic bag that contained suspected prescription pills. The pills were later identified as approximately 1,000 of suspected counterfeit Oxycodone pills. Some of the pills were found to be pink in color and imprinted with M-10. Others of the pills were found to be blue in color and imprinted with M-15. Due to the color and imprint, which I know through my training and experience is inconsistent with manufacture identifiers, the pills were suspected to be counterfeit. The seized pills were field tested with an approved reagent and showed positive result for the presence of fentanyl. ECHEVARRIA was arrested and charged with various State of CT violations.

157.    Based on the quantity of pills located on ECHEVARRIA at the time of the stop, and the nature and circumstances of the meeting with HINTON, and a review of GPS data for one of HINTON's vehicles that indicated several meetings occurring at the Ocean State Job Lot in Meriden, investigators believe that ECHEVARRIA is a repeat customer of HINTON and on this occasion purchased a bulk quantity of pills that he intended to distribute to others.

## H.    **STEPHENS Assists HINTON with Controlled Substance Distribution and Dark Web Parcel Drops**

158.    As set forth below, STEPHENS was observed on July 30, 2024 with HINTON meeting with suspected drug customers and also has been observed on August 7, August 16,

August 23, and August 26, 2024 transporting packages containing suspected controlled substances from TARGET LOCATION 1 and placing them in the U.S. Mail for HINTON.

### i. HINTON and STEPHENS Conduct Suspected Hand-to-Hand on July 30, 2024

159.    On July 30, 2024, investigators conducted live electronic surveillance of TARGET LOCATION 2. Investigators observed a Blue Kia Forte parked in front of the residence, later confirmed to be operated by Shawn STEPHENS. Both HINTON and STEPHENS entered into TARGET LOCATION 2. Shortly thereafter, HINTON and STEPHENS exited TARGET LOCATION 2 and departed the area in the Kia.

160.    HINTON and STEPHENS were then observed arriving at TARGET LOCATION 1 in the blue Kia and entering into the building.   Moments later, investigators observed both HINTON and STEPHENS exit TARGET LOCATION 1 and depart the area in the Kia.  Physical surveillance was established on the Kia as it traveled through East Haven into New Haven and eventually parking on Willow St. across from Archie Moore's Restaurant. HINTON and STEPHENS remained in the vehicle. Surveillance observed the blue Kia move up the street in the direction of Orange Ave and park in a different spot on the right side of the street. Surveillance observed a dark colored SUV parked behind the Blue Kia. A law enforcement database check indicated that this vehicle was registered to an individual referred to herein as "K.B." who is known to investigators as HINTON's former girlfriend. Surveillance observed HINTON exited the Kia and walked to the driver door of K.B.'s vehicle. Surveillance observed HINTON conversing with a black female with long curly black hair and sunglasses on. HINTON had reached into the open driver side window and appeared to be counting out money inside of the vehicle. A few moments later, an older black female exited the passenger side, and a young black male emerged from the

back seat in order to greet HINTON. After greetings were exchanged HINTON walked back to the Kia and got back into the passenger seat as K.B.'s vehicle departed the area.

161.    Surveillance was maintained as HINTON and STEPHENS remained parked on the street inside the vehicle. Surveillance observed a white Toyota Camry arrive in the area and turn into the parking lot of Archie Moore's Restaurant. A check of the law enforcement database indicated that this vehicle is registered to an individual referred to herein as "A.Z." of Hamden, CT.   Investigators recognized this vehicle as a potential drug customer of HINTON's that has frequented TARGET LOCATION 2 over the course of the investigation. Subsequently, the blue Kia turned around and pulled into the same parking lot as A.Z.'s white Toyota Camry. Investigators observed the white Toyota Camry backed into the parking space directly to the left of where surveillance was parked. Moments later, investigators observed the blue Kia nosed into the parking spot next to the Toyota Camry. Investigators observed the driver of the Toyota Camry to be a short black male with a short bear wearing a white t-shirt, later identified as A.Z. from his DMV photograph. A.Z. got out of the Camry and walked to the driver side of the blue Kia and reached into the opened window. Seconds later, investigators observed A.Z. get back into the driver seat of the white Toyota Camry. Investigators observed HINTON, STEPHENS and A.Z. depart the parking lot of the Archie Moore's restaurant. Through my training and experience the observed meeting was indicative of a hand-to-hand narcotic transaction.

## ii.    STEPHENS Mailing USPS Parcels for HINTON

162.    During the month of August 2024, investigators have routinely observed STEPHENS at TARGET LOCATION 1.  Specifically, investigators have observed STEPHENS meeting with HINTON at TARGET LOCATION 1 and staying for hours. STEPHENS was also observed on occasion at TARGET LOCATION 1 without HINTON and appearing to access TARGET LOCATION 1 with a set of keys.  On several dates, investigators observed STEPHENS

leaving TARGET LOCATION 1 with blue reuseable Walmart bags that appeared to contain USPS postal boxes. HINTON has also been routinely observed utilizing this type of bag to carry USPS parcels containing narcotics from TARGET LOCATION 1 to the Post Office to mail, and similar bags filled with USPS parcels have been observed on HINTON's dark web vendor page.

163.    On August 7, 2024, for example, while reviewing the electronic surveillance of TARGET LOCATION 1, SA Lang noticed HINTON was already at the shop and a blue Kia Forte arrived being operated by STEPHENS. SA Lang observed STEPHENS carrying a blue reusable Walmart bag  that appeared empty as he entered the shop.

164.    SA Lang then observed STEPHENS exit the shop carrying a blue reusable Walmart bag that now appeared weighted and full. STEPHENS entered the driver seat of the blue Kia Forte with the bag and departed the area.  A short time later, SA Lang observed the blue Kia Forte return to the shop. STEPHENS exited the vehicle empty handed and entered back into the shop.

165.    On August 12, 2024, Postal Inspector Maynard reviewed the surveillance cameras inside of the Post Office lobby and at the self-service kiosk (SSK). The footage confirmed that on August 7, 2024, after leaving TARGET LOCATION 1, STEPHENS had walked into the Post Office lobby with the blue reusable Walmart bag and mailed parcels via the SSK and the counter inside. Notably, the footage captured the blue Kia parked outside in the driveway in front of the front post office lobby doors.

166.    Investigators have been reviewing live and recorded surveillance footage daily. On August 16, 2024, August 23, 2024, and August 26, 2024, STEPHENS has been observed leaving TARGET LOCATION 1 with the blue reusable Walmart bag that appeared full and weighted. Based on my knowledge of the investigation, investigators believed STEPHENS would travel to the Post Office to mail USPS parcels containing narcotics in furtherance of the HINTON DTO.

Based on surveillance footage from inside the post office located at 50 Brewery St. New Haven, CT, on the above referenced dates STEPHENS placed pre-posted USPS parcels into the SSK and on the counter inside the lobby.

### iii.    *The August 26, 2024 Mailing by STEPHENS*

167.    On August 26, 2024, Postal Inspector Maynard contacted USPS personnel and requested that USPS Priority parcels with the return addresses of the following associated names be detained if found in the USPS collection box for the 50 Brewery Street lobby: "Tony's Auto Service," "Grand Beauty Supply," "Petrillo's Used Auto," and "Edge of the Woods." Each of these return addresses had been previously identified by investigators as being used by HINTON including based on physical surveillance of HINTON or an associate making the drop, seizure and analysis of the contents of the packages and examination of the contents inside, including pills, many of which contained similar markings and similar controlled substances, and also based on HINTON's use of third-party cryptocurrency, pre-paid postage, as discussed above.

168.    On this same date, Inspector Maynard was notified that eight parcels associated with these return addresses were placed into the mail stream. Inspector Maynard detained three (3) of the parcels which are identified as follows:

a.    USPS Tracking Number 9405 5362 0624 8790 2234 63 addressed to "Melissa Newman, 25 Parker Ave, West Haven,CT 06516" and bearing a return address of "Tony's Auto Service Inc, 599 Lombard Street, New Haven, CT 06513"

b.    USPS Tracking 9405 5362 0624 8792 5831 52 addressed to "Yu Lu, 382 N Lemon Ave #199, Walnut, CA 91789" and bearing a return address of "Edge of the Woods, 379 Whalley Ave, New Haven, CT 06511"

c.    USPS Tracking 9405 5362 0624 8792 5826 36 addressed to "Brad Speer, 16205 W 141st Terrace, Olathe, KS 66062"and bearing a return address of "Edge of the Woods, 379 Whalley Ave, New Haven, CT 06511"

169.    On August 28, 2024, the Honorable Robert A. Richardson authorized the search of the three packages. The first parcel, addressed to "Melissa Newman" contained one clear zip lock

style, approximately 50 small round light blue colored tablets imprinted with "A 215." The second parcel, addressed to "Yu Ju," contained: (1) approximately 500 small round blue colored tablets imprinted with "K" "9"; (2) approximately 1,000 small round light blue colored tablets imprinted with "A 215"; (3) approximately 500, small round blue colored tablets imprinted with "ALG" "265"; (4) approximately 1,000 small light green round tablets imprinted with "M" "15"; (5) approximately 1,000 oval shaped yellow tablets imprinted with "PERCOCET" "10"; (6) approximately 1,000 round yellow tablets imprinted with "C 230", and (7) approximately 1,000 small light green round tablets imprinted with "M" "15." The third package, addressed to "Brad Speer," contained a small quantity of marijuana.

170.    The above reference narcotics, including the size, imprinting, color, and visual quality, appear to be consistent with seizures and purchases previously made in this investigation of pills that contained controlled substances. In addition, the above referenced pills were field tested utilizing the TruNarc analyzer, yielding a positive result for the presence of acetaminophen. Although the test did not return a presumptive positive for any other opioid, investigators in this case know that when testing pills distributed by HINTON that were subsequently confirmed by the lab to contain more obscure synthetic opioids within the illicit drug market, such as protonitazene and isotonitozene, the TruNarc analyzer will either return a presumptive positive for the presence of fentanyl (a similar substance also within the opiate family) or will not return a presumptive positive for any opioid. However, investigators know that the HINTON DTO is using acetaminophen as an ingredient in the counterfeit pressed pills, making the detection of acetaminophen here, relevant to determining the additional substances in these pills. Moreover, the field tested pills from these packages were visually similar in quality to the pills seized

elsewhere in the investigation, furthering investigators belief that the lab tests for these pills will show that they contained controlled substances.

## IV.    CONCLUSION

171.    As set forth above, there is probable cause to believe, and I do believe, that Kelldon HINTON, Heishim HARRIS, Emanuel PAYTON, Shawn STEPHENS and Arnaldo ECHEVARRIA have committed, are committing, and will continue to commit the Target Offenses discussed above, and therefore respectfully request the issuance of arrest warrants and criminal complaints.

172.    In addition, I believe that there is probable cause to support the issuance of a search warrant for 34 Tyler Street Extension, East Haven, CT ("TARGET LOCATION 1"), and 55 Dewitt Street, New Haven, CT, ("TARGET LOCATION 2"), as well as a 2023 Gray Chevy Malibu bearing NY marker plate LJX9536 (TARGET VEHICLE 1) pursuant to Federal Rule of Criminal Procedure 41.

Respectfully submitted,

ANDREW          Digitally signed by ANDREW
PFEIFFER (Affiliate)   PFEIFFER (Affiliate)
                Date: 2024.09.04 11:25:14
                -04'00'
_____
Andrew Pfeiffer
Task Force Officer
Drug Enforcement Administration


The truth of the foregoing affidavit has been attested to me by TFO Andrew Pfeiffer over the telephone on this 4th day of September, 2024.

Robert M.        Digitally signed by Robert M.
Spector          Spector
                Date: 2024.09.04 13:23:17 -04'00'
_____
HON. ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

### Property to Be Searched

34B Tyler Street Extension in East Haven, Connecticut, is described as a single bay garage with a white 12' x 7' garage door. It is the first garage bay from the main building. The garage bay can be accessed through a side door entrance that is located in the breezeway.



**Front of 34B Tyler Street Extension**

## ATTACHMENT A-2

### Property to Be Searched

55 Dewitt St. in New Haven, Connecticut is a single family house with a two tone vinyl. The first floor of the residence is white faux brick and the second floor is yellow. The residence has a metal chain link fence in the front of the property. The second floor has black metal fire escape above the driveway.



## ATTACHMENT A-3

### Property to Be Searched

Target Vehicle 1 is described as a four-door gray Chevrolet Malibu bearing NY marker plate LJX9536.

## ATTACHMENT B

### Particular Things to be Seized

The following items evidencing violations of 21 U.S.C. §§ 841(a)(1) and 846 (Manufacturing, Distributing or Dispensing, or Possessing with the Intent to Manufacture, Distribute or Dispense a Controlled Substances and Conspiracy to do the same) (collectively, the "Target Offenses"):

1. Any controlled substance (all of which could be in any form) and items containing residue of controlled substances;

2. Paraphernalia used and commonly associated with the possession and distribution of controlled substances, including, but not limited to: scales, packaging materials, including plastic baggies, plastic or glass vials, heat sealing machines, pipes, grinders, funnels, presses, pill punches/dies, sifting screens and/or strainers, and any materials used for "cutting" or diluting controlled substances;

3. Any books, records, receipts, notes, ledgers, journals, travel documents, and other papers relating to the purchase and distribution of controlled substances;

4. Bank statements, tax records, financial statements and records, safe deposit keys, storage unit keys, receipts, and other books and records, including any related to the purchase of real property and personal property (including automobiles), and, in general, any records or documents evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the use of monies generated by the sale of controlled substances.

5. United States currency, stocks, bonds, certificates of deposit, any other financial instruments, money counters, and the contents of any safes or other security type boxes or locked boxes and containers, including any jewelry, precious metals and gems, such as gold, silver and diamonds evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the sale of controlled substances;

6. Business receipts, invoices, records of accounts payable and receivable, and general ledgers;

7. Identification documents and keys evidencing a possessory interest in premises, vehicles and storage containers;

8. Records relating to ownership, occupancy, or use of the Target Premises (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers);

9. Records relating to the operation or ownership of any computer hardware, software, storage media, or data (such as user names, passwords, telephone records, notes, books, diaries, and reference materials);

10. Records pertaining to accounts held with companies providing Internet access or remote storage of either data or storage media;

11.  All computer equipment and peripherals that may be interdependent, the software to operate the computer system, related instruction manuals that contain directions concerning the operation of the computer system, the software programs, and all electronically stored or computerized computer data; any physical keys, encryption devices, dongles, passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data;

12.  Any computer equipment or digital devices that are capable of being used to commit or further the crimes referenced above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes, including central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices including paging devices and cellular telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communication devices such as modems, routers, cables, and connections; storage media; and security devices;

13.  Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes referenced above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes;

14.  Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing, equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes referenced above, or to create, access, process, or store evidence, contraband, fruits, or instrumentalities of such crimes;

15.  All passwords, passphrases, encryption keys, encryption dongles, and/or any information, including tools, records, and techniques used to activate and/or navigate and access in plain-text data stored in encrypted data systems, encrypted filesystems, encrypted files, and encrypted records or documents;

16.  All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) of the computers or digital devices during the time the device was used to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email, instant messages, and other electronic  communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software;

17.  Records of any communications relating to drug trafficking; and

18.  Firearms and ammunition.